## 54533. SAULS v. ESTATE OF NORMA F. AVANT.

WEBB, Judge.

Norma Faye Avant died testate at the age of twenty-four on October 9, 1972. For most of her life she suffered from a congenital condition known as

agammaglobulinemia, a rare blood disease which causes the inability to develop immunity to infection. As a result she constantly suffered from lung, ear and sinus infections, was in and out of the hospital, and was overprotected and coddled by her parents. In 1959 when she was ten, Norma Faye's mother was struck by lightning and killed and her father remarried shortly thereafter. Friction which existed between her and her stepmother increased after her father's death in September of 1969, and in January of 1970 she moved into her own apartment.

She stopped taking her medication and began drinking and entertaining lavishly, bestowing cars and other expensive gifts on boyfriends and fair-weather friends. Although her father's accountant, a family friend and two different lawyers retained by Norma Faye all attempted to help her budget her inheritance, she refused to heed any guidance. This profligate spending quickly exhausted approximately $50,000 from her share of her father's estate.

On August 15, 1971, she gave birth to an illegitimate child, William Norman Avant. The child was conceived despite the warning of her physician that she should never become pregnant, and the baby inherited her rare disease. Also against the advice of her physician, Norma Faye decided to raise her child alone. Shortly thereafter, however, in poor health again she offered the child to a friend, Jeanette Johnson, for adoption. Mrs. Johnson told her sister, Jo Ann Wooten, about the child and Mrs. Wooten and her husband, who are deaf-mutes, agreed to adopt him. Norma Faye delivered the child to the Wootens and apparently signed all the necessary forms, for on May 2, 1972, the adoption was completed.

On November 9, 1971, two days after she turned her child over to the Wootens, Norma Faye reentered the hospital suffering from bronchiectasis. While there she attempted to telephone one of her old boyfriends, Danny Sauls, and talked to his father, the appellant Griffin Sauls, Sr., for the first time. Sauls was recovering from a severe heart attack and suffered from serious heart disease, but he began to visit Norma Faye frequently in the hospital. He testified that Norma Faye was worried

and distressed at this time because she had no money and had no one to turn to and no place to go when she left the hospital. She required daily medication and breathing apparatus, and was in constant pain. Her doctor released her on November 22 but no one showed up to take her home, so she remained in the hospital through Thanksgiving Day, November 25. Sauls discussed her problem with his sister, Barbara Godwin, who lived across the street from him, and she agreed that Norma Faye could stay with her until she could straighten out her affairs.

On November 24, Norma Faye telephoned Attorney Helen Berenthien and asked her to come to the hospital to draw a will for her. Miss Berenthien went to Norma Faye's room on Thanksgiving morning, discussed the terms of the will and was told of Norma Faye's illegitimate son. She went to her office to type the will and returned to the hospital with it that afternoon where it was signed and witnessed. The instrument left Norma Faye's entire estate to Sauls as executor and trustee to educate his three sons, with the remainder to be divided between Sauls and his wife. There was no mention or provision for her child or her paternal grandparents who were then living.

Upon her discharge Norma Faye went to Mrs. Godwin's home where she remained until January, 1972 when her condition worsened and she was placed in a nursing home where she died on October 9, 1972. During that time she had no money and Sauls paid all her medical and other bills, and also obtained some welfare and Social Security benefits in her behalf.

Subsequent to Norma Faye's death, Sauls underwent extensive tests and open heart surgery. The surgery was only 40% successful, and he remains totally incapacitated from employment with great physical difficulties.

About three years after Norma Faye's death application for letters of administration was filed by William Norman Avant Wooten by and through his next friend, Jeanette Johnson. After consulting with Miss Berenthien and the attorney now representing him, and being advised that the will was valid, Sauls then offered it for probate in solemn form. William Norman Avant

Wooten filed his caveat to the petition, alleging that the will should be denied probate as he was the sole heir at law of Norma Faye Avant; that Sauls procured the purported will by misrepresentation and fraud; that Norma Faye Avant lacked testamentary capacity and was not of sound and disposing mind and memory; that she was under the undue influence of Sauls; and that she was suffering from insane delusions. It was stipulated that the estate consisted of $12,000 in cash, an insurance policy of $1,000, and 428 acres of farm land in Washington County, Georgia, valued at $300 an acre.

The probate judge found in favor of the caveator on all grounds alleged, Sauls appealed to the superior court and a jury again found in favor of the caveator. Sauls then petitioned the probate court for attorney fees from the estate of Norma Faye Avant for his efforts in attempting to probate the will. This petition was denied and on appeal to the superior court denied again. It is from that judgment denying attorney fees that this appeal is taken.[1]

Although Sauls enumerates seven errors, the sole issue for consideration is whether he acted in "good faith" in attempting to probate the will so as to entitle him to expenses and attorney fees from the decedent's estate under Code Ann. § 113-619. The threshold question, however, is what the General Assembly intended in the statutory proviso that no executor may recover ". . . unless the person so named proceeds in good faith."

1. As noted by the probate judge in an exhaustively researched and excellently written 17-page judgment, there is a paucity of case law in Georgia on the propriety of awarding attorney fees to an executor who is unsuccessful in his attempt to have a will admitted to probate, and to date there are no reported cases dealing with Code Ann. § 113-619 (Ga. L. 1943, p. 423). Prior to the enactment of the statute in 1943, the rule was that "[w]hen the executor has probated the will in common form and the heirs at law require a probate in solemn form, the executor is entitled

---

[1] This appeal was initially filed in the Supreme Court (*Sauls v. Estate of Norma Faye Avant,* No. 32368) and transferred to this court by order of June 29, 1977.

to have the court costs and counsel fees paid out of the estate. This is true even though the caveat is successful and probate in solemn form is refused, unless the probate in common form was originally made in bad faith on the part of the executor in an attempt to defraud the heirs at law. Redfearn on Wills &c. (Rev. ed.) 167, § 113; *Davison v. Sibley,* 140 Ga. 707 (79 SE 855); *Irwin v. Peek,* 171 Ga. 375 (155 SE 515)." *Samples v. Samples,* 194 Ga. 383, 388 (2) (21 SE2d 601) (1942).

One year later the legislature apparently attempted to resolve the problem of when to award expenses and attorney fees to unsuccessful will propounders with the 1943 statute (Code Ann. § 113-619) by making the good faith proviso determinative. However, no cases defining good faith have since arisen.[2]

Nor does the case law of other jurisdictions provide persuasive guidance. As noted by the drafters of the annotation in 40 ALR2d 1409, § 2 (1955), "Because of variances in the controlling statutes, and because even under the statutes the question is often one of an equitable nature, depending upon the weight given a large variety of more or less intangible factors by the court in the exercise of its informed discretion, it is extremely difficult to lay down any useful general rules which will reconcile all or most of the cases. Basically, two considerations appear to be of considerable importance: (1) whether the person seeking the allowance occupied a status which cast

---

[2] In *Alford v. C. & S. Nat. Bank,* 237 Ga. 194, 198 (226 SE2d 905) (1976), the Supreme Court held that "where the actual contest in a will construction case is between beneficiaries of the estate, and the personal representative is merely a stakeholder as in this case, it is error for the trial court to award attorney fees to the actual contesting litigants out of the assets of the estate." The corporate executor here sought a declaratory judgment rather than probate of the will and the question of payment of attorney fees was not addressed, so Code Ann. § 113-619 was not applicable. *McFarland v. Lumpkin,* 110 Ga. App. 222 (138 SE2d 194) (1964), cited therein, involved attorney fees of a temporary administrator.

upon him the duty of attacking or defending the purported will, and (2) whether the 'estate' received any benefit from the efforts of the applicant and his attorney. . . The two considerations may be one, in so far as it may be said that the duty to establish or attack the will exists only to the extent that it appears that the estate will benefit thereby. . . . In several cases, the question has been not whether the estate was in fact benefited, but whether the executor acted primarily in a representative capacity in propounding the will, or whether his efforts were directed primarily to preserving his own interests as a distributee under the will."

Thus, in some cases recovery has been denied from the estate on the theory that the executor acted as a volunteer, having no duty to defend the will. See, e.g., Re Doty's Estate, 203 NW 865 (Mich. 1925); Re Arnold's Estate, 8 P2d 897 (Cal. 1932); Re Kesl's Estate, 161 P2d 641 (Mont. 1945); Re Faust's Estate, 73 A2d 369 (Pa. 1950); Re Ballard's Estate, 247 SW2d 683 (Mo. 1952); Re Healy's Estate, 76 NW2d 677 (Minn. 1956); Lane v. Cronin, 185 NE2d 635 (Mass. 1962); Re Estate of Workman, 262 NE2d 408 (Ind. App. 1970).

In a Florida case interpreting the statutory requirement of good faith the Court of Appeals of that state reasoned: "In the case sub judice, Rast was both the executor named in the will and the proponent thereof, and it was his alleged undue influence upon the deceased that prompted this Court in the former appeal herein to disallow the will to probate. In this situation it could not be seriously contended that he offered the will in such good faith that the County Judge should be held by this Court to have abused his discretion in denying fees and costs." Re Estate of MacPhee, 216 S2d 489, 492 (Fla. App. 1968).

Considering the instant situation in the light of these cases, the probate court specified that the question of whether Sauls had acted in good faith did not turn upon the issue of devisavit vel non, "that good faith was an ultimate fact and meant honest belief, and that the fact that the executor's personal interest might be involved was immaterial." Williams v. Hankins, 245 P 483 (Colo. 1926). It determined, however, that if Sauls did in fact

exercise fraud *or* undue influence over the testator in the procurement of the will, he could not have had reasonable grounds for believing the propounded will to be valid and operative, and therefore as a matter of fact would be proceeding in bad faith. Thus, a finding of fraud or undue influence in the procurement of the will sought to be probated indicates bad faith and prevents recovery under Code Ann. § 113-619. We think this precept is reasonable and equitable, and hereby approve it.

2. Having adopted this construction, we must now determine whether there was evidence to support the finding that Sauls exercised undue influence over Norma Faye Avant in the procurement of her will.[3]

"A person may by will make any disposition of his property not inconsistent with the laws or contrary to the policy of the State. Code § 113-106. It is provided by Code § 113-208: 'The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the testator.' And it must be shown that the undue influence was operative on the mind of the testator at the time the will was actually executed and published. *Cook v. Washington,* 166 Ga. 329 (143 SE 409). In *Bohler v. Hicks,* 120 Ga. 800 (5) (48 SE 306), it was said: 'Undue influence which operates to invalidate a will is such influence as amounts either to deception or to force and coercion, destroying free agency.' In this connection it has been held: 'Honest persuasion to make a will of a certain kind, though constant and importunate and though accompanied by tears and entreaties, does not constitute undue influence, in the absence of fraud or duress . . . provided the testator is in a mental condition to make a

---

[3] The probate court found that although there was evidence of "possible misrepresentations" after execution of the will, there were no misrepresentations shown prior to its execution and the evidence was thus insufficient to sustain a finding of fraud in the *procurement* of the will.

choice between following his original intention or of yielding his view in favor of the wishes of the other person.' *Boland v. Aycock,* 191 Ga. 327 (2) (12 SE2d 319). See also *Ward v. Morris,* 153 Ga. 421 (112 SE 719). Furthermore, 'A person standing in confidential relation to another is not prohibited from exercising any influence whatever to obtain a benefit to himself. The influence must be what the law regards as undue influence. Such influence that is obtained by flattery, importunity, superiority of will, mind, or character, which would give dominion over the will to such an extent as to destroy free agency, or constrain one to do against his will what he is unable to refuse. Such is the kind of influence which the law condemns as undue.' *DeNieff v. Howell,* 138 Ga. 248 (6) (75 SE 202). As was said also in *DeNieff's* case: 'There can be no fatally undue influence without a person incapable of protecting himself as well as a wrong-doer to be resisted.' Evidence which does no more than show opportunities for exercising influence. . . falls short of showing the exercise of undue influence required to invalidate a will. *Orr v. Blalock,* 195 Ga. 863, 866 (25 SE2d 668); *Brumbelow v. Hopkins,* 197 Ga. 247, 251 (29 SE2d 42)." *Morgan v. Ivey,* 222 Ga. 850, 852 (2) (152 SE2d 833) (1967). See also *Waldrep v. Goodwin,* 227 Ga. 560 (181 SE2d 837) (1971); *Gray v. Alexander,* 229 Ga. 722, 723 (1) (194 SE2d 108) (1972); *Powell v. Thigpen,* 230 Ga. 760 (1) (199 SE2d 251) (1973); see generally 1 Redfearn, Wills and Administration in Ga. 106, § 53 (3rd Ed.).

The probate court here found that Norma Faye Avant had led a very sickly and overprotected childhood which caused her to be overly dependent upon those around her for guidance and any decisions she had to make. According to the testimony of Dr. Birdsong who treated her from the time she was 12 until she was 21, "she was easily influenced and she would give anything away if she liked you and anybody could influence her." There was also evidence that she wrote to the executor of her father's estate, a long-time friend, confidant and business associate, expressing her desire to have him or someone else manage and guide her personal and financial affairs and that she offered to leave him everything she owned after her death. Dr. Daniel, who admitted her to the

Riverside Clinic on November 9, 1971, testified that she was very depressed and distressed because of her debilitating illness and because she felt she had no one to whom to turn when she left the hospital. He also stated that she was emotionally immature and "was seeking anybody who would talk to her, give her attention and time." It was while she was in this state of mind that she met Sauls for the first time.

Sauls immediately took a great interest in Norma Faye, and even though he was himself suffering from serious heart disease, he spent a substantial amount of time with her while she was confined in the Riverside Clinic from November 9 through November 26, 1971. When Norma Faye told him that she had no place to go he offered her a home in his sister's house, which she accepted. Although she had been aware for some time that she did not have long to live, according to the testimony of Dr. Daniels, she had not previously executed a will. However, less than two weeks after meeting Sauls she insisted that an attorney come to her hospital room on Thanksgiving Day for that purpose. Both the probate court and the superior court in its de novo hearing noted that Sauls' testimony was vague and inconclusive as to his knowledge of the will and its contents prior to execution, and that he could not remember how or when he came into possession of a copy of it.

Both courts also based their findings on two additional irregularities indicating undue influence: (1) Sauls' failure to file the will for probate for more than three years after Norma Faye's death, and then only after application for letters of administration was made[4]; and (2) the unreasonableness of the dispository scheme, it appearing from testimony and letters that Norma Faye had repeatedly asserted, both before and after executing the will, that her child was the dearest thing in her life and that she would see to it that he was heir to whatever estate she had.

---

[4] Code § 113-615 requires an executor to offer the will for probate "as soon as practicable after the death of the testator," and to qualify within 12 months after it is admitted to record "unless restrained by the will."

While the evidence considered was almost entirely circumstantial and Sauls' testimony so credible that had we been the trier of fact a different conclusion might have been reached, nevertheless we are unable to say that an abuse of discretion has occurred, particularly in light of the testatrix's life-long illness and resultant dependent personality, and of her repeated avowals of love for the child who was ignored in her will. "An attack on a will as having been obtained by undue influence may be supported by a wide range of testimony, since such influence can seldom be shown except by circumstantial evidence. Thus, a confidential relationship between the parties, the reasonableness or unreasonableness of the disposition of the testator's estate, old age, or disease affecting the strength of the mind, tending to support any other direct testimony or any other proved fact or circumstance going to show the exercise of undue influence on the mind or will of the testator, are relevant. While the quantity of influence varies with the circumstances of each case, according to the relations existing between the parties and the strength or weakness of mind of the testator, the amount of influence necessary to dominate a mind impaired by age or disease may be decidedly less than that required to control a strong mind. [Cits.]" *Fowler v. Fowler,* 197 Ga. 53, 54 (2) (28 SE2d 458) (1943); *Perkins v. Edwards,* 228 Ga. 470, 475 (7) (186 SE2d 109) (1971).

*Judgment affirmed. Deen, P. J., and Birdsong, J., concur.*

ARGUED SEPTEMBER 8, 1977 — DECIDED SEPTEMBER 22, 1977 — REHEARING DENIED OCTOBER 12, 1977 —

*O. L. Crumbley,* for appellant.
*Donald W. Huskins,* for appellee.