725 A.2d 90 (1999)
319 N.J. Super. 252
In the Matter of the PROBATE OF the ALLEGED WILL OF Elliott LANDSMAN, a/k/a Louis Landsman, Deceased.
Superior Court of New Jersey, Appellate Division.
Argued January 12, 1999.
Decided March 12, 1999.
*91 Eugene J. Sullivan, for appellant/cross-respondent Marvin Greenwald, former executor *92 (Tompkins, McGuire & Wachenfeld, attorneys; Howard G. Wachenfeld and Michael S. Miller, of counsel; Messrs. Wachenfeld and Miller, Newark, and Matthew P. O'Malley, Hackensack, on the brief).
Abe Rappaport, Clifton, for appellant, Marvin Greenwald personally.
Cindy Nan Vogelman, for respondent/cross-appellant Bernice Simon (Chasan, Leyner, Bariso & Lamparello, and Fox, Rothschild, O'Brien & Frankel, attorneys; Ms. Vogelman, Michael W. Roche, Secaucus, Allison Accurso and Richard E. Wegryn, Lawrenceville, on the brief).
Melvyn H. Bergstein, Roseland, for Administrator C.T.A. (Walder, Sondak & Brogan, attorneys; Melissa E. Flax, on the brief).
Before Judges KEEFE, EICHEN, and COBURN.
The opinion of the court was delivered by KEEFE, J.A.D.
In this will contest, the trial judge found that the executor, Marvin Greenwald (Greenwald), exerted undue influence over the testator, Elliot Louis Landsman (Landsman), in the making of two wills, one in 1988 and the other in 1990. Greenwald does not contest the finding of undue influence in the making of the 1990 will, but he appeals from the judge's finding that he exerted undue influence over the decedent in the making of his 1988 will. He also claims that the suit should have been dismissed as untimely. Additionally, he claims that the judge erred in ordering him to reimburse the estate for monies he distributed, in denying his second application for counsel fees, and in ordering him to return his executor's commissions.
The objector, Bernice Simon, an incompetent by her guardian Seth Simon (Simon), cross-appeals, asserting that the judge erred when he granted attorneys' fees from the estate under the executor's first application.
Landsman died on April 11, 1990, at the age of 88. He was married to Ruth until her death in 1981. They had no children. Landsman had five brothers and sisters, none of whom survived him. His sister Florence Freeman, who died less than two months before him, had a daughter, Bernice Simon, the objector herein. Bernice had two children, Joan Simon and Seth Simon. Landsman's brother William had a son named Max, who was married and had five children. Landsman's sister Marion Simon had two children, Michael Simon and Stephen Simon.
Landsman prepared two known wills in his lifetime, one in 1988 and another five days before he died in April 1990. Among other things, the 1988 will bequeathed $10,000 to Marvin and Janet Greenwald, and held that in the event that both of them predeceased him, the gift should lapse. He bequeathed $5,000 to his "beloved niece" Bernice Simon, and $5,000 each to Joan and Seth. He bequeathed $25,000 to his sister Florence. Landsman also made numerous bequests to various Jewish charities. He named Greenwald as his executor and gave him the power to distribute the residuary estate to charitable Jewish organizations in the United States and Israel.
The 1990 will increased the amount of the Greenwalds' bequest to $25,000 and removed the lapse clause. The twenty-third clause of the will stated: "I hereby expressly make no provision, and leave no bequests to the following individuals: my niece BERNICE SIMON, my grand-niece JOAN SIMON; and my grand-nephew SETH SIMON, for reasons best known to me and them, and best not repeated here." Greenwald was continued as the executor of the will and given the power to distribute the residuary estate to Jewish charities. The 1990 will also provided that the inheritance taxes be paid out of the estate. Landsman's estate was worth almost $333,000.
On April 27, 1990, Greenwald filed a complaint to probate the 1990 will. On July 10, 1990, a judgment of incompetency was entered finding Bernice Simon to be incompetent. The order appointed attorney Cindy Vogelman as temporary guardian over the person and property of Bernice. Shortly thereafter, Vogelman instituted suit on behalf of Simon challenging her mother Florence's will in which the Greenwalds were *93 named beneficiaries and Marvin was named executor. On January 22, 1991, an amended judgment of incompetency was entered, naming Seth Simon, Bernice's son, as permanent guardian. Vogelman remained as attorney. On January 29, 1992, Vogelman filed a verified complaint on behalf of Simon, objecting to the probate of Landsman's will.
Greenwald filed a motion seeking to dismiss the verified complaint based on the complaint being filed out of time. The judge granted Simon's motion to extend the time in which to file a verified complaint and denied Greenwald's motion to dismiss the complaint.
After a plenary trial in the Freeman and Landsman will contests,[1] the judge issued a written decision that set aside both Landsman's 1988 and 1990 wills as the products of undue influence by Greenwald. The judge ordered all commissions and bequests received by Greenwald to be returned to the estate, as well as any bequests distributed by Greenwald.
In an order dated October 10, 1995, the trial court awarded counsel fees to Simon's and Greenwald's lawyers. The judge appointed Melvyn H. Bergstein as administrator of the estate. Thereafter, Greenwald filed a notice of motion seeking an award of counsel fees, which was denied.
The Administrator C.T.A. recovered some of the distributions made from Landsman's estate and made a motion to surcharge Greenwald for a portion of the estate funds that could not be recovered. On March 14, 1997, after oral argument, the judge entered judgment against Greenwald for $152,500.
Greenwald filed a timely notice of appeal and Simon filed a cross-appeal.
Some of the facts pertinent to an understanding of the issues are as follows. Greenwald and his wife Janet met Landsman through his sister Florence, some time in the 1970s, and they saw each other three or four times per year. After Ruth died, Greenwald called Landsman two or three times per week to see how he was. They did not, however, see each other socially. In 1984 or 1985, Landsman told Greenwald, who ran an income tax preparation service, that he wanted him to prepare his income tax returns. Greenwald prepared Landsman's returns each year from 1985 until Landsman's death.
In early 1988 Florence executed a will in which Greenwald was the executor. Afterward, according to Greenwald, Landsman asked Greenwald if he would serve as his executor as well.
The attorney who prepared Florence's will, Stephen Cochi, met the Greenwalds at his engagement party and wedding, where the Greenwalds' daughter was a bridesmaid. Greenwald prepared Cochi's tax returns and was his accountant. Cochi referred clients to Greenwald.
According to Cochi, shortly after Florence's will was executed, he received a phone call from Landsman saying that Florence had referred him and he wanted to make his will. Cochi said Landsman suggested that he give the information to Greenwald who would relay it to Cochi. Greenwald gave Cochi a typewritten itemized list of Landsman's wishes from which Cochi prepared the will.
Cochi learned, though he could not remember how, that Landsman was blind. Because of that, he set up the will to have Florence sign it on Landsman's behalf. Upon meeting Landsman on the day the will was to be executed, May 18, 1988, Cochi learned that Landsman had some vision and was capable of reading. According to Cochi, he and Landsman went over the will together, in Florence's presence, and Landsman followed along, interrupting at times. Cochi asked Landsman why he was leaving certain charities more money than Bernice, Joan, and Seth, and Landsman told him that he was not happy with them over the way they treated Florence. Uncertain as to how Landsman's limited vision impacted the will signing, Cochi had Florence sign on Landsman's behalf, even though he was satisfied that Landsman could see.
*94 The witnesses to the 1988 will were Cochi and Nicholas Pirro. Pirro was a part-time employee of Greenwald's since 1978. He did not recall witnessing the will, but admitted that his signature was on it. Louis Katz notarized Landsman's will, although he did not recall doing so. Katz was an insurance salesman who maintained free office space in Greenwald's office. Greenwald was Katz's client and also referred clients to him.
From September 1988 to August 1991, Rabbi Daniel Wasserman was the rabbi at Agudath Sholom Temple in Jersey City, where Landsman attended services every morning and evening. Wassermann and his family had Landsman as a guest at all major Jewish holidays because the rabbi had been told by the former rabbi that Landsman was alone. Landsman mentioned his sister Florence once or twice, but never mentioned any other family members. Landsman never mentioned the Greenwalds to him either. At every holiday, Landsman gave the rabbi an envelope with cash of unusual amounts, such as $87.50, $142, and $26. When Wasserman tried to decline, Landsman would tell him to take it because he had no one else to give it to.
Wasserman, aware that Landsman had very poor eyesight, gave Landsman large print prayer books and saw Landsman use a magnifying glass. Landsman always "had his wits about him" and had "fierce independence." Wasserman believed that if he was aggrieved by family members, Landsman would exclude them from his will.
Philip Klein met Landsman in 1953 and saw him every day at the synagogue, and also saw him daily on the train while Landsman was still working. Klein knew Landsman's sight was not good, and saw him use a magnifying glass at times. Klein would walk Landsman home from the synagogue when it was dark. Klein said Landsman was not the type of person to speak ill of another, but he held strong opinions. Landsman never mentioned his family or the Greenwalds.
Golda Kruger was Ruth's sister. Golda saw Landsman and Ruth "fairly often" until her sister's death. In 1986, Golda moved one-half block from Landsman, and then she saw him twice a week. She helped Landsman with his grocery shopping and drove him to doctor appointments. When Landsman went into the hospital and then the nursing home in late 1989, Golda saw him once a week. She described Landsman as a private man, who was stubborn and had strong opinions. He paid no attention to people he did not like. According to Golda, Landsman was disappointed in Bernice's behavior toward Florence. Landsman never mentioned Seth or Joan.
Golda was aware of Landsman's vision problems and saw him use a magnifying glass, but he never wore glasses. She wrote out his checks and he would sign them.

I.
Greenwald argues that because the challenge to the probate of the will was not timely filed, it should have been dismissed.
Under the rule in effect at the time, R. 4:80-7(a):
If a will has been probated in common form, any person aggrieved by the judgment may, without notice, move for an order requiring the plaintiff to show cause why the judgment should not be set aside or modified; provided however the motion for the order to show cause is presented to the court or clerk within 3 months[2] after entry of the judgment....
R. 4:80-7(d) permitted the court to extend the limitations period for thirty days "upon a showing of good cause and the absence of prejudice."
Greenwald first raised the time-bar issue on March 12, 1992, in a motion to dismiss the complaint. He argued that the will was admitted to probate on April 27, 1990, and thus, Simon's complaint in January 1992 was barred by the court rule. Greenwald argued below and here that a complaint filed by Vogelman, counsel and temporary guardian for Simon, in the Florence Freeman will contest was evidence of her knowledge of Simon's claim under Landsman's will. In the Freeman complaint filed August 27, 1990, *95 Vogelman stated, "The Simons believe that the Greenwalds engaged in a pattern and practice of preying upon elderly members of their family based on their age, infirmity and helplessness." The complaint also pointed out that Landsman left nothing in his will to his niece Bernice, his grandniece Joan, or his grandnephew Seth, and that "the Simons are unaware of any reason for this specific omission."
Greenwald also pointed out that although the complaint was not filed until January 29, 1992, it was dated May 2, 1991. Greenwald claimed that this was evidence that Bernice's guardians and counsel knew of her rights under Landsman's 1990 will and waited eight months to file for no legitimate reason. Greenwald claimed that prejudice had accrued both to him and certain devisees who acted under the fair assumption that the probate of the will was not to be challenged.
Bernice argued that her counsel and guardians did not know, nor should they have known, of Bernice's cause of action simply because she was not included in Landsman's will. Although the Simon family had their suspicions about Greenwald, attorney Vogelman felt the information was not sufficient to file a complaint, so she sought discovery. Her attempts by deposition to obtain information concerning Landsman's prior wills, the circumstances of the signing of his will, and other information pertaining to Landsman were refused by Cochi and Greenwald. The nursing home where Landsman was a patient at the time of his 1990 will signing was also uncooperative in providing information concerning his physical and mental condition.
According to Vogelman, it was not until a settlement conference in the Freeman matter on January 9, 1992, that she learned Landsman had a prior will that, unlike the 1990 will, included the Simon family. At that time, Vogelman determined that there was sufficient information to file a complaint.
After oral argument on the motion, the judge held that the time period provided in R. 4:80-7(a) and (d) had to be relaxed in the interests of justice. The judge's decision to relax the Rule is supported for two interrelated reasons. The first is that Vogelman had no standing to challenge Landsman's will on behalf of Simon until she could establish that Simon was injured by the probate of the 1990 will.[3]In re Myers' Will, 20 N.J. 228, 235, 119 A.2d 129 (1955); In re Coleman's Will, 27 N.J.Super. 532, 535, 99 A.2d 812 (App.Div.1953). If Landsman had a will prior to 1990 that was executed without undue influence and nonetheless excluded Simon as a beneficiary, Simon would have no standing to challenge the 1990 will. See In re Myers' Will, supra, 20 N.J. at 236, 119 A.2d 129. It was, therefore, prudent on Vogelman's part to inquire into the existence of Landsman's prior wills and their content in order to determine whether Simon would benefit from a challenge to the 1990 will. Inquiry into the circumstances under which any prior wills were executed was also prudent because Simon would be required to bring the existence of those wills to the court's attention and state her position with respect to the validity of any prior wills, if the probated will was to be challenged. In re Hand's Will, 95 N.J.Super. 182, 188-91, 230 A.2d 408 (App.Div.), certif. denied, 50 N.J. 286, 234 A.2d 395 (1967). While Vogelman suspected Greenwald's undue influence in connection with both the Freeman and Landsman wills, she had no knowledge of any prior wills and was stonewalled in her efforts to obtain such information by Greenwald and Cochi. The trial judge's finding that Vogelman did not learn of Landsman's prior will, and the Simon family's status as beneficiaries under that will, until January 1992 is supported by the record. Because Greenwald possessed the critical information concerning the facts upon which Simon's standing was premised and kept that information from her, he cannot complain about the delay in obtaining it.
*96 The second reason stems from the "exceptional" circumstances and "just determination" concepts of our court rules. R. 4:50-1(f); R. 1:1-2; Court Inv. Co. v. Perillo, 48 N.J. 334, 341, 225 A.2d 352 (1966). In re Karamus, 190 N.J.Super. 53, 62, 461 A.2d 1193 (App.Div.1983), upon which the trial judge relied, stands for the proposition that the ordinary time limits for a will contest can be relaxed "in an appropriate case to prevent injustice." See also, Pressler, Current N.J. Court Rules, comment on R. 1:1-2 and R. 4:50-l(f). Often the question of whether justice is best served by the relaxation of the time-bar cannot be fully appreciated until after the plenary hearing has taken place. Here, Greenwald's undue influence over Landsman and his less than candid responses to Vogelman's attempt to gain information from him justified the otherwise late challenge.
Further, Greenwald's claim of prejudice stemming from the late challenge is non-meritorious. The very information upon which he relies to argue that Vogelman knew about his suspicious involvement in the Landsman will, i.e., the allegations contained in the Freeman complaint, served notice on him that he might be challenged on the Landsman will as well. Indeed, Cochi testified that he advised Greenwald not to make any distribution under Landsman's will until he determined whether that challenge could be made. Vogelman's attempt to obtain information from both Greenwald and Cochi at depositions should have served as further warning to Greenwald. Thus, any prejudice accruing to Greenwald stemming from his distribution of estate funds, see infra part IV, was his own doing.

II.
Greenwald concedes the correctness of the trial judge's findings as to the existence of a "confidential relationship" and "suspicious circumstances" that warranted shifting the burden of proof to him as to the 1988 will. Haynes v. First Nat'l State Bank, 87 N.J. 163, 177-78, 432 A.2d 890 (1981). He contends, however, that the trial judge erred in requiring him to rebut a presumption of undue influence by clear and convincing evidence with respect to the 1988 will. He claims that the correct burden of persuasion in these circumstances would have been a preponderance of the evidence, and if that burden was applied to the evidence, he would have carried his burden. Greenwald impliedly concedes that if the judge was correct in his ruling on this issue he did not overcome the burden.
When the trial judge addressed this point in his written opinion he referred the parties to his analysis on the same issue in the Freeman matter. In that case, after finding the presence of a confidential relationship and suspicious circumstances, the judge, referring to Haynes, supra, imposed the higher burden of proof, stating:
The reasoning behind the imposition of the higher burden of proof is "the need for a lawyer of independence and undivided loyalty, owing professional allegiance to no one but the testator." Id. at 179[, 432 A.2d 890]. Looking at the disciplinary rules applicable to attorneys, the Haynes [C]ourt noted that an attorney is prohibited from "engaging in professional relationships that may impair his independent and untrammeled judgment with respect to his client." [Id.] at 180[,432 A.2d 890].
Furthermore, "[a] conflict of interest, moreover, need not be obvious or actual to create an ethical impropriety. The mere possibility of such a conflict at the outset of the relationship is sufficient to establish an ethical breach on the part of the attorney." Id. at 181[, 432 A.2d 890].
In our view, the trial judge captured the essence of the principle of law that undergirds the Haynes decision. Greenwald's argument in his brief that "Mr. Cochi had no conflict of interest in any meaningful sense that required imposition of the clear and convincing evidence standard" is not itself convincing. RPC 1.7 provides in pertinent part:
b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to ... a third person, or by the lawyer's own interests, unless:
*97 (1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after a full disclosure of the circumstances and consultation with the client....
Cochi referred clients to Greenwald and Greenwald reciprocated. Clearly, Cochi and Greenwald had a mutually beneficial relationship. Greenwald was also Cochi's personal and professional "accountant." Such relationships are of the kind that ordinarily engender a sense of loyalty, irrespective of the absence of a true attorney-client relationship. Cochi financially benefitted from his relationship with Greenwald and it was in his best interest to preserve it, yet he did not disclose his relationship with Greenwald to Landsman.
Further, there was evidence in the case that called Cochi's independence into question. The information upon which Landsman's 1988 will was drafted came to Cochi in the form of a typewritten statement prepared by Greenwald, not the testator. That three page document revealed that Greenwald was both the executor of the estate and a beneficiary. Indeed, Greenwald's bequest was larger, for the most part, than Landsman's heirs. Cochi claimed that he had telephone conversations with Landsman concerning Greenwald's memo but kept no notes of those conversations and could not remember how many conversations took place before he met Landsman in person for the first time on the day the will was executed. Despite his several alleged conversations with Landsman, Cochi did not know that Landsman was blind for "tax purposes" but could otherwise read print with the aid of a magnifying glass. Accordingly, he prepared the will as if Landsman was completely blind, learning that Landsman could actually read the will only on the day that it was executed. Further, Cochi made no effort, despite his alleged concern that Greenwald was an executor, beneficiary, and confidant of Landsman, to assure that the people who attended the signing of the will would have no connection with Greenwald. Instead, he allowed Greenwald to supply the notary and a witness, both of whom had some personal and business relationship to Greenwald. Nicholas Pirro, a part-time employee of Greenwald who witnessed the will with Cochi, did not recall witnessing it, but admitted that the signature was his. Louis Katz, who maintained office space in Greenwald's office, notarized the will but did not recall doing so. These facts clearly reveal Cochi's failure to give Landsman his undivided loyalty and independent advice.
As the Supreme Court noted in Haynes, supra:
[T]here may be situations other than those raised in this case, which require that the presumption of undue influence be overcome by clear and convincing evidence rather than the normal requirement that only a preponderance of the evidence need be proven. (citation omitted). Thus, for example, Judge Clapp would impose the higher burden "where the finger of suspicion points strongly at the proponent, implicating him with the alleged undue influence and ... where the rebuttal of the presumption must come from him." 5 N.J. Practice (Clapp, Wills and Administration) § 62 (3d ed.1962, Supp.1980).
[87 N.J. at 183-84, n. 6, 432 A.2d 890.]
How much independent input Landsman had in the making of his 1988 will insofar as his desire to benefit Greenwald hinged largely on the testimony of Cochi, which was at times vague to say the least. Thus, in view of his relationship with Greenwald and the circumstances under which the will was executed, including the relevance of RPC 1.7, we think it appropriate to place the higher burden of proof on Greenwald.
Because Greenwald faults the trial judge's conclusion as to the 1988 will only if the lower burden of proof is applied, we affirm the judgment to the extent that it finds Greenwald unduly influenced Landsman for his benefit and that of his wife.

III.
Greenwald argues that the trial judge erred when he refused to strike only those portions of the 1988 will that were subject to Greenwald's undue influence. Where the undue influence affects only a portion of the *98 will, the affected portion can be severed and the remainder of the will can be enforced. In re Bartles' Will, 129 N.J. Eq. 280, 19 A.2d 17 (E. & A.1941); In re Lattouf's Will, 87 N.J.Super. 137, 142, 208 A.2d 411 (App.Div. 1965); In re Cooper's Will, 75 N.J. Eq. 177, 71 A. 676 (Prerog.Ct.1909), aff'd sub nom. Harrison v. Axtell, 76 N.J. Eq. 614, 75 A.1100 (E. & A.1910). The trial judge recognized In re Lattouf's Will, supra, but held that "the undue influence [was] so pervasive" that he could not "equitably" carve the offending portions from it. He gave no reasons for that conclusion, notwithstanding the fact that the impact of his decision was to have Landsman's estate pass by intestacy when it is clear from the record that Landsman did not so intend. See R. 1:7-4.
The overwhelming evidence in the record is that Landsman had testamentary capacity in 1988. Testamentary capacity exists where the testator can comprehend the property he is about to dispose of, the natural objects of his bounty, the meaning of the business he is engaged, the relation of each of those factors to the others, and the distribution that is made by the will. Gellert v. Livingston, 5 N.J. 65, 73, 73 A.2d 916 (1950). Old age and failure of memory do not of themselves take away a testator's capacity. Id. at 77, 73 A.2d 916. Nor does blindness destroy it. In re Skewis' Will, 2 N.J.Super. 114, 119, 64 A.2d 892 (App.Div.1949).
The evidence showed that in 1988, Landsman, then eighty-six years old, lived alone in an apartment. Twice a day he walked to and participated in religious services. Only when it was dark did his friend Klein walk him home. According to Klein, his mental condition was "fine." Golda Kruger helped Landsman do his grocery shopping and drove him to doctor's appointments but found him to be "sharp." He was not then forgetful or confused. Every Sunday, he took several buses to North Bergen from Jersey City to visit Florence. According to Rabbi Wasserman, Landsman always had his "wits about him."
It appears that the judge's comments, and nearly all of the arguments made in Simon's appellate brief, concerning Landsman's health were clearly applicable only in 1989 and 1990, during his final illness, and not at the time the 1988 will was signed.
Testamentary capacity may exist but the testator may nonetheless, because of age or physical condition, be subject to undue influence. The concepts are separable. Indeed, if Landsman did not have mental capacity there would be no need to inquire into Greenwald's undue influence. 1 Page on Wills, § 15.4 (Bowe-Parker rev.1960);see also In re Liebl's Will, 260 N.J.Super. 519, 617 A.2d 266 (App.Div.1992), certif.denied, 133 N.J. 432, 627 A2d 1138 (1993); In re Cooper's Will, supra. The question is to what extent was Landsman's will overcome by the undue influence of Greenwald. If the evidence shows that Greenwald's sole concern was for himself and his influence did not affect the other provisions of the will, it would be as inequitable to defeat Landsman's purpose as it would be to allow Greenwald to benefit from his perfidy. Thus, we have examined the record to discover whether the 1988 will, exclusive of the provisions that benefit Greenwald, are the product of Landsman's natural impulses or resulted from Greenwald's improper influence. See In re Cooper's Will, supra.
With the exception of the exclusion of his sister Marion's children, Michael and Stephen Simon, Landsman provided for all of his immediate heirs in the 1988 will. See In re Liebl's Will, supra, 260 N.J.Super. at 525, 528-29, 617 A.2d 266 (stating that the exclusion of family members does not of itself prove anything about capacity or undue influence). Landsman provided for other individuals, such as friends and clergymen, who had meant something to him in his life. In February 1988, Landsman told Philip Klein, a longtime friend, that he intended to remember Klein's kindness in his will. Indeed, he did so. There was no evidence in the record that the other designated non-charitable beneficiaries were not the natural objects of Landsman's bounty.
As to the charitable bequests, there was uncontroverted testimony in the record from Rabbi Wasserman that Landsman was a charitable man. Landsman gave the rabbi a gift on every Jewish holiday. Klein also *99 testified as to Landsman's charitable nature. Joan Simon admitted that she had no reason to believe that the individual bequests to charities were not the true wishes of Landsman.
In short, we find no evidence in the record to support the trial judge's conclusion that Greenwald's undue influence was so pervasive as to affect the remainder of the will. Removal of the Greenwalds as beneficiaries and Marvin Greenwald as executor of the 1988 will is all that is necessary to cure the effect of Greenwald's undue influence over Landsman. We order that the 1988 will be admitted to probate.

IV.
Greenwald asserts that the court erred in holding him liable for acts of administration or distributions that were authorized at the time of the action.
N.J.S.A. 3B:14-4 states that:
A fiduciary appointed in the place of a removed or discharged fiduciary ... may sue for assets as shall have come into the possession of the discharged or removed fiduciary for any breach of trust, waste, embezzlement or misapplication thereof and may sue for the recovery of the assets of the estate against the discharged or removed fiduciary or against any other person in possession of the assets.
Bergstein, the Administrator C.T.A., sought a judgment against Greenwald for the money expended from the estate by Greenwald that could not be recouped. The trial judge entered judgment against Greenwald for $152,500 representing the amount of funds from the estate distributed by Greenwald that could not be recovered. The judge held that
Mr. Greenwald should not be permitted to profit from his own wrong. The estate should not be required to pay the bills to recoup monies that he spent when he knew or should have known, this thing was coming. It was down the pike.
....
And I think your argument that he did [it] under [ ] a [color] of title, is not correct.
I think that [the] estate has to be made whole as best as possible. I think it's inequitable and inappropriate for the estate to bear the costs of maintaining multiple lawsuits to recoup what should have beenwhich should not have been done in the first place.
Under N.J.S.A. 3B:10-24, "A personal representative shall not be surcharged for acts of administration or distribution if the conduct in question was authorized at the time. Subject to other obligations of administration, a probated will is authority to administer and distribute the estate according to its terms." Greenwald relies on this statute for his argument that he should not have been held liable for acts that were authorized at the time of their performance.
In In re Beales' Estate, 13 N.J.Super. 222, 228-29, 80 A.2d 311 (App.Div.), certif. denied, 7 N.J. 581, 83 A.2d 381 (1951), the court quoted Heisler v. Sharp, 44 N.J. Eq. 167, 172, 14 A. 624 (Prerog.Ct.1888), aff'd, 45 N.J. Eq. 367, 19 A. 621 (E. & A. 1889), in which it was observed that "[N]o man is infallible; the wisest make mistakes; but the law holds no man responsible for the consequences of his mistakes which are the result of the imperfection of human judgment, and do not proceed from fraud, gross carelessness or indifference to duty." Greenwald recognizes the authority of In re Beales' Estate, supra, but he claims that the record provides no basis for the trial court's finding of fraud because "a confidential relationship and suspicious circumstances hardly amount to fraud." Greenwald also objects to the imposition of liability for actions taken by him as executor long after the time to file objections to the will had passed.
Inasmuch as we have upheld the 1988 will to the extent that it excludes any benefit to the Greenwalds, we find no justification to surcharge Greenwald for distributions to charities or individuals that were named in the 1988 will. To the extent that he made those distributions he was, in essence, carrying out Landsman's wishes under the 1988 will. Greenwald's conduct in procuring a benefit for himself and his wife through undue influence is not necessarily tantamount to "fraud, gross carelessness *100 or indifference to duty" in the administration of the entire estate. In re Beales' Estate, supra, 13 N.J.Super. at 229, 80 A.2d 311.
A different result must abide, however, as to the distribution made to Golda Kruger, who was not named in the 1988 will, as well as any distributions made by Greenwald under the 1990 will's residuary clause. To the extent that there is insufficient money to satisfy the beneficiaries under the 1988 will that have not received their specific bequests, or the full amount of those bequests, Greenwald should be surcharged. The surcharge is based on general principles of equity. Greenwald's knowledge that his role in the procurement of benefits for himself in the Landsman estate was being questioned as early as the filing of the Freeman complaint, and the fact that Cochi advised him against making distributions until any challenge had run its course, warrant a finding that Greenwald acted with gross carelessness or indifference to duty to the extent that distribution was made to beneficiaries not named in the 1988 will. Ibid. Accordingly, we remand for a recalculation of the surcharge.

V.
On October 10, 1995, the judge granted Greenwald's first application for counsel fees in the amount of $60,000. He then denied Greenwald's second application for counsel fees and disbursements, which sought $18,875.72.
Greenwald argues that the judge erred when he denied his second application for counsel fees. In her cross-appeal, Simon argues that the judge erred in awarding Greenwald any counsel fees at all. Based on the undue influence of Greenwald, we hold that he was not entitled to any attorneys' fees from the estate.
"Counsel fee allowance is a matter which rests in the sound discretion of the trial court. An appellate tribunal will not interfere unless the record discloses manifest misuse of the discretion." In re Bloomer's Estate, 43 N.J.Super. 414, 416, 129 A.2d 35 (App.Div.), certif. denied, 23 N.J. 667, 130 A.2d 428 (1957). R. 4:42-9(2) permits fees to be awarded:
Out of a fund in court. The court in its discretion may make an allowance out of such a fund, but no allowance shall be made as to issues triable of right by a jury. A fiduciary may make payments on account of fees for legal services rendered out of a fund entrusted to the fiduciary for administration, subject to the approval and allowance or to disallowance by the court upon settlement of the account.
R. 4:42-9(3) permits fees to be awarded:
In a probate action, if probate is refused, the court may make an allowance to be paid out of the estate of the decedent. If probate is granted, and it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate.
"Fund in court" has been defined as "where it is in the hands of a fiduciary who is a party before the court and when it is within the court's jurisdictional authority to deal with it." In re Thornton's Estate, 169 N.J.Super. 360, 369, 404 A.2d 1222 (App.Div.), certif. denied, 81 N.J. 401, 408 A.2d 795 (1979). "In order for an attorney to be entitled to compensation for his services from a `fund in court' he must have aided directly in creating, preserving or protecting the fund. (citation omitted). He is not entitled to such an award if his client sues merely for his own interest or benefit." Shilowitz v. Shilowitz, 115 N.J.Super. 165, 188, 278 A.2d 517 (Ch. 1971), modified, 119 N.J.Super. 311, 291 A.2d 383 (App.Div.), certif. denied, 62 N.J. 72, 299 A.2d 70 (1972). "[A]llowances are payable from a `fund' when it would be unfair to saddle the full cost upon the litigant for the reason that the litigant is doing more than merely advancing his own interests." Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 168, 162 A.2d 834 (1960).
Simon contends that Greenwald's undue influence in procuring the will precluded his offering the will for probate in good faith and in the interests of the estate; the will was offered only for his own benefit and not for the proper administration purposes, and *101 thus, attorneys' fees should not be allowed under either rule. Greenwald maintains that all of the actions of his attorney were taken in good faith on behalf of the estate, and therefore, attorneys' fees should be paid out of the estate.
There is only one New Jersey case addressing this issue, In re Peppler's Will, 134 N.J. Eq. 160, 34 A.2d 291 (E. & A.1943). In that case, the lower court denied probate where it found the executor procured the will by undue influence. 132 N.J. Eq. 421, 429-30, 28 A.2d 474 (Prerog.Ct.1942). The trial court also denied counsel fees from the estate, but without giving a reason. 134 N.J. Eq. at 160, 34 A.2d 291. The Court of Errors and Appeals stated, "An executor offering a will for probate, acting in good faith and without proof of fraud, is entitled to costs out of the estate, whether probate be granted or refused." Id. at 161, 34 A.2d 291. The Court then held: "In this case, the gross abuse of the trust and confidence placed in appellants by testatrix warrants the assessment of counsel fees against them personally." Ibid.
Several other jurisdictions have addressed this issue, and have determined that attorneys' fees should not be permitted. Iowa had a statute, similar to our Rules 4:42-9(2) and (3), permitting the award of attorneys' fees where an executor defended or prosecuted any proceedings regarding the will, whether or not successful. In re Estate of Olson, 479 N.W.2d 610, 612, 614 (Iowa App. 1991), the executors, however, were found to have procured the will by undue influence. The trial court held that the executors' defense of a will challenge was "strictly for their personal benefit, and had nothing to do with the orderly administration of the estate." Id. at 614. The Appellate Court upheld the judge's denial of counsel fees for the executor. Id. at 615.
Under similar factual circumstances and a similar statute, the court in In re Estate of Kaufmann, 51 Misc.2d 560, 273 N.Y.S. 2d 533, 536 (Surr.Ct.), modified, 26 A.D.2d 818, 273 N.Y.S.2d 902 (App.Div.1966), denied attorneys' fees, stating that based on the undue influence exerted by the executor, "the offer of the will for probate by the proponent is in and of itself an act of bad faith and an attempt to deceive the court and defraud the natural objects of the decedent's bounty from their rightful share in his estate." The court held that where the jury found that the "executor exercised undue influence to procure the execution of a will in his own favor and the performance of this so-called `duty' becomes the means by which a fraud may be perpetrated, the allowance of a fee would constitute a perversion of justice." Id. 273 N.Y.S. 2d at 537.
We acknowledge that other jurisdictions have come to a different result. See In re Estate of Hand, 475 So.2d 1337, 1338 (Fla.App.1985), rev. denied, 484 So.2d 8 (1986); Sauls v. Estate of Avant, 143 Ga.App. 469, 238 S.E. 2d 564, 567 (1977); and Inre Estate of Pfleghar, 35 Wash.App. 844, 670 P. 2d 677, 680 (1983), rev. denied, 100 Wash. 2d 1036 (1984). However, we believe In re Peppler's Will, supra, expresses the sounder approach to such issues.
Greenwald's efforts in offering the will for probate were to benefit himself. Even though most of the 1988 will can be saved, it was Greenwald's perfidy that brought about the litigation. Greenwald should bear the cost of the litigation, not the estate. Therefore, the trial judge did not abuse his discretion in refusing to make a second attorneys' fee award, but did abuse his discretion in making the first award of fees. Greenwald shall refund the estate for $60,000 in counsel fees awarded to him on October 10, 1995.

VI.
Greenwald contends that the judge erred when he ordered him to return to the estate all the commissions he had been paid as executor of the estate. Greenwald received the commissions under the 1990 will, which the judge found invalid, and which he does not now contest.
N.J.S.A. 3B:18-5 states, "Where a fiduciary is removed for any cause, the Superior Court may direct that his commissions be forfeited." Greenwald recognizes this, but claims that the question is when it is appropriate to deny commissions to an executor that has been removed because of a post-probate *102 determination that the will was invalid. The question posed and cases cited by Greenwald miss the real issue, which is whether it was correct to deny an executor commissions under a will that was determined to be invalid, based on the wrongful conduct of the executor.
There are no New Jersey cases that address this specific point. However, general principles of New Jersey law combined with law from states that have addressed this specific issue lead to the conclusion that the judge did not abuse his discretion in denying Greenwald commissions generated under the 1990 will.
"Commissions are allowed as compensation for the faithful discharge of duty." Fluck v. Lake, 54 N.J. Eq. 638, 644, 35 A. 643 (Prerog.Ct.1896). The court in In re Jula's Estate, 3 N.J. Misc. 976, 979-80, 130 A. 733 (Orphans Ct.1925), made the concept more explicit when it said, "It is also well settled that commissions are a compensation for the faithful discharge of duties, and that, when an administrator violates that duty, he will not be entitled to commissions."
Courts in two other jurisdictions have considered the precise question at issue here, and all have determined that where an executor procures the will by undue influence, he is not entitled to commissions. In In re Limberg's Estate, 281 N.Y. 463, 24 N.E.2d 127, 128 (1939), the court stated:
The second question is whether one who procures the execution of a will by fraud and undue influence, appeals from a decision of a Surrogate's Court and contests until a final decision of this court, which affirms the decree entered upon the verdict of a jury that the will was procured by fraud and undue influence, is entitled to any commissions alleged to have been earned while acting as executor. It seems to us that a statement of the question carries with it the answer. This is not like a case where one named as executor is not a party to a fraud and offers a will for probate which on its face is in legal form, and the will is offered in good faith. Here the jury has found not only a lack of good faith, but actual fraud and undue influence. In such circumstances one named as executor should not be permitted to benefit by his own wrongful act.
The Florida Appeals Court concurred with that reasoning in In re Estate of Radon, 338 So.2d 256, 258 (Fla.App.1976), where it concluded that an executor who was found to have procured the will by undue influence was not entitled to commissions because by definition, a person who had procured the will by undue influence could not have offered the will for probate in good faith. "The personal representative of an estate should not be permitted to benefit from his or her own wrongful act." Ibid.
Greenwald claims that "there is no question that the trial court found no fraud in connection with the probate of [Landsman's] 1990 will." While that statement may be technically correct, the court clearly found undue influence, which is a species of fraud, in the procurement of the will and in Greenwald's appointment as executor. Therefore, to permit commissions under the 1990 will would permit Greenwald to benefit from his wrongdoing and offend notions of justice.

VII.
In summary, we hold that the challenge to the 1990 will was timely. The 1988 will shall be admitted to probate. The Greenwalds shall not take under the will. Marvin Greenwald is removed as executor and shall receive no commissions or counsel fees from the estate. Marvin Greenwald shall reimburse the estate for counsel fees previously approved by the trial court. In addition, Marvin Greenwald shall be surcharged as provided in part IV of this opinion for distributions made under the 1990 will. The matter is remanded for the purpose of recalculating the surcharge and for any other proceedings deemed necessary by the trial court. Jurisdiction is not retained.
NOTES
[1] The cases were not consolidated but tried back-to-back. The Landsman case followed the Freeman case.
[2] Effective September 4, 1990, the time period was enlarged to four months. R. 4:85-1.
[3] Greenwald does not apparently dispute Simon's argument that the period in which she had to file her objection to probate under R. 4:80-7 was tolled by her incompetency until a guardian was appointed for her and the guardian knew or should have known of the facts necessary to form a cause of action. We do not pass upon the question of whether N.J.S.A. 2A:14-21 would apply to this cause of action since it is not necessary to a resolution of this issue.