953 A.2d 454

IN THE MATTER OF THE ESTATE OF MADELEINE
L. STOCKDALE, DECEASED.

Argued October 9, 2007—Decided July 22, 2008.

*Frederick J. Dennehy* argued the cause for appellant, *Ronald J. Sollitto* (*Wilentz, Goldman & Spitzer,* attorneys; *Mr. Dennehy* and *Richard F. Lert,* of counsel; *Mr. Dennehy, Mr. Lert, M. Matthew Mannion* and *Cheryl E. Connors,* on the briefs).

*Michael A. Casale* argued the cause for respondent, pro se.

*William J. Gearty* argued the cause for respondent, *Spring Lake First Aid Squad* (*Mr. Gearty* and *Linda Kenney Baden,* attorneys).

Justice HOENS delivered the opinion of the Court.

In this matter, we consider questions relating to the circumstances in which it is appropriate to award punitive damages against a party in a Probate Part proceeding who has engaged in undue influence in the creation of a will or a testamentary trust, or in securing an inter vivos transfer of property in lieu thereof. We do so in order to explain more fully the earlier decisions of the Court referring to this potentially additional remedy in the unique context of Probate Part proceedings.

We conclude that, actions arising from disputed wills and related documents designed to dispose of estate assets and which rest on allegations of undue influence are most often resolved through the equitable remedies available in the Probate Part. We further conclude that, although a finding that a party has engaged in undue influence may also, consistent with our common law notions of making an injured party whole and deterring particularly egregious behavior, support an award of punitive damages, the circumstances in which a punitive award is permitted are limited. Because the Appellate Division, in determining that punitive damages would be appropriate in this matter, based its analysis on an assumption that this remedy is broadly available in the Probate Part, however, we affirm that judgment with modifications.

I.

The facts and circumstances that bring this matter to our attention are complex and they unfolded over a period of several years leading up to the death of Madeleine Stockdale, the testatrix; we derive them from the extensive record compiled during the lengthy proceedings in the Probate Part.

Stockdale was, by all accounts, a highly intelligent and sophisticated businesswoman and investor for much of her adult life. Her late husband had been a successful bank officer, and the couple resided in a large home in Spring Lake, which was located near the beach on Monroe Avenue. Following her husband's death in 1965, she worked for many years selling real estate in Spring

Lake. Stockdale continued to reside in the home that she had shared with her late husband and which she loved dearly. In spite of her considerable wealth, she lived frugally, often wearing threadbare garments and keeping her home "barely heated" in the winter. As the years went by, her once-grand home began to fall into disrepair and she periodically talked about selling it. However, she told others that she would only be willing to sell the home to someone who would restore it to its former grandeur and who would agree not to subdivide it.

Always distant from others, as the years passed, she grew distrustful, harboring deeply held concerns that other people were only interested in her for, or because of, her money. Stockdale had no children and no family save for two nephews, George and Peter Lawrence, with whom she had little contact, largely because she suspected that they, too, were after her money. She ceased having any meaningful contact with them many years prior to the events in issue. Over time, Stockdale became somewhat reclusive, agreeing to associate only with a few people whom she considered to be her "acquaintances" and limiting when and how they could see her in person or speak with her by telephone. In particular, two families, the Pattersons and the DiFeos, were among Stockdale's acquaintances and, in general, they looked after her. In spite of her distrustful and reclusive lifestyle, members of these families visited with her, made certain that she was properly fed, invited her to their homes for holiday dinners, and attempted to include her as part of their families.

Although she was generally distrustful of others, Stockdale was fascinated by those people who engaged in acts of selflessness and charity. In particular, she was touched by the kindness of the pastor of a local church that she did not attend, but who had regularly donated blood for her husband simply because the two shared a rare blood type. In one of the wills that she executed, she left $100,000 to his church in appreciation for this generosity from a man who was otherwise a complete stranger to her. Similarly, she was impressed by the good works of the Spring

Lake First Aid Squad, a completely volunteer organization of people who would drop whatever they were doing and rush to the aid of anyone who called. She came to appreciate their acts of selflessness and kindness when they attended to her after an automobile accident and when they came to assist her late husband during one of his periods of illness, and began including the First Aid Squad in her will in 1965.

Hand in hand with her distrust of others and her concern that others wanted her money, Stockdale had an intense dislike for the government and the taxes it extracted from its citizens. Although she did not give much to charities during her lifetime, she repeatedly told her acquaintances that she planned to leave her estate to charity. She intended to do so partly out of respect for those who engaged in these selfless acts of kindness, but also because it would keep her assets away from the control of the government. Indeed, when she died, she had a document in her purse that included her burial instructions and a typewritten expression of her intention that "most" of her estate would go to "charity."

Stockdale prepared a number of wills during her lifetime, and all of the ones prior to 1998 included substantial charitable donations, precisely for these reasons. From time to time, the identity of the beneficiaries of her largess changed as she became disenchanted with various organizations and substituted others in their places. In some cases, she changed her mind about a particular charity for reasons known only to her, on other occasions, she did so because she concluded that one or another of the charities was devoting an insufficient percentage of its funds to charitable works, as opposed to payment of administrative expenses.

The events that culminated in Stockdale's death and in the dispute about her estate began in 1997, when Ronald Sollitto, a podiatrist, began to live year-round in a house he and his wife, Patricia, owned which was about a block away from Stockdale's. In September 1997, Stockdale listed her home for sale, pricing it at $1.4 million. Although real estate agents showed the property

to interested potential buyers, and although Stockdale was shown homes she could purchase nearby when hers was sold, her home did not attract a buyer willing to pay her asking price and Stockdale remained in it.

Sollitto liked Stockdale's house very much and when he saw a real estate agent standing on the sidewalk outside of it, he expressed his interest in purchasing the home. Sollitto then decided to introduce himself to Stockdale directly. Shortly after meeting her, Sollitto and his wife began to help Stockdale around her house and to bring her food, all the while expressing how much they liked her home.

In March 1998, Stockdale executed the first of the two wills ("1998 Will") that were eventually offered for probate and that are at the center of the dispute in this matter. Although her age during the time of the events in issue cannot be precisely identified based on the available records, there is no doubt that by 1998 she was at least in her late 80's or early 90's, that she was living alone in the house on Monroe Avenue, and that she was already in declining health. Since the mid-1980's, Stockdale had been suffering from a variety of health problems and ailments, including headaches and double vision; inflammation of the arteries to the brain; thyroid disease; and bone marrow disease. A CAT scan taken in May 1997 revealed that Stockdale had suffered a "tiny stroke."

The 1998 Will was prepared for Stockdale by William Soons, an attorney from Englewood who had been handling her legal affairs, and who had drafted her previous wills, at no charge to her, since her husband had died in 1965. Mrs. DiFeo, one of the kind and caring neighbors who continued to look after Stockdale, and who Stockdale considered to be among her "acquaintances," drove her to the Soons law office in Teaneck, receiving nothing in return, simply so that Stockdale would be able to execute her new will. The 1998 Will named Soons as the co-executor of the estate, along with Peter Kuzmick, who resided in Sea Girt. In that will, Stock-

dale directed that her home be sold on her death and that the proceeds be included in her residuary estate.

The 1998 Will included a substantial number of specific bequests, the majority of which were to religious entities and to individuals known to Stockdale, and the residuary beneficiary was the Spring Lake First Aid Squad, which she directed to use the proceeds "for construction of a new building and purchase of a new ambulance." This was a change from her previous wills, and it was made shortly after she had told Soons that she intended to leave the First Aid Squad a specific bequest of $100,000. The record does not reflect why she instead elected to leave all of the residuary estate to the First Aid Squad and there is evidence that she later considered a further change, to reduce the share that would go to the First Aid Squad, when that organization received a large sum of money from another source.

On the same day she executed her 1998 Will, Stockdale entered into another listing agreement with a different real estate agency to sell her home, which she then listed for a price of $1.65 million. She told the agency's owner that if Sollitto bought the property, no commission would be due, probably because she already knew of his interest in her house. In March 1999, Sollitto offered to buy the home for $1 million, an offer that Stockdale rejected. Nevertheless, the two then began to discuss the sale of the home.

According to Sollitto, he promised Stockdale that he would not subdivide the property, that he would restore the home to its former grandeur, and that he would allow Stockdale to remain as a resident in the property until she was ready to leave. Although none of these promises was in writing, Stockdale was eventually induced to sign a proposed contract to sell the property to Sollitto for $1.3 million. That contract was prepared by Thomas Foley, an attorney retained by Sollitto, and, in addition to making no mention of the various promises Sollitto had made to Stockdale, it included a variety of other terms that were not favorable to her.

Later in March, Stockdale retained Soons, her longtime lawyer, to review the contract and to represent her in connection with the

sale of the residence. Soons concluded that the terms were so unfavorable that the deal was not in Stockdale's best interest, and he contacted Sollitto's lawyer, Foley, expressing his reasons for alarm in a letter dated March 26, 1999. In particular, Soons raised a concern that the deal was contingent on the sale of Sollitto's home and thus was entirely one-sided, that there was no provision that would permit Stockdale to remain in the home as she wished and had been promised, that there was no clarification about mortgage terms, and that in reality the contract was only an option to purchase that Sollitto had no obligation to fulfill. Matthew Cohen, who was a law partner with Soons, also related these concerns to Foley.

Rather than continuing the negotiations with Soons, who was representing Stockdale, Foley instead prepared an addendum to the contract and gave it to Sollitto, his client. Sollitto went directly to Stockdale with the proposed addendum. According to Sollitto, Stockdale was not concerned about any of the terms about which Soons had raised an objection and she signed the addendum, which was then forwarded to Cohen. After Soons reviewed the addendum, he was still concerned, and, unaware that Sollitto had already given it to Stockdale directly and had secured her consent, Soons spoke to Stockdale. She told him that he should not be worried because she had decided not to sell the home at all. After hearing that instruction from his client, Soons closed his file, believing that the deal had not been finalized.

In fact, however, and unbeknownst to Soons, Stockdale and Sollitto continued forward with new aspects of the agreement. The record reflects that during the summer, Sollitto convinced Stockdale to take back a purchase money mortgage, which, although he asserted was in recognition of the anticipated costs that he would bear in renovating the residence, was plainly not in her interest. Nevertheless, she acceded to his wishes in general, with no discussion about the amount of the mortgage, the interest rate, or any of the other terms that would ordinarily be negotiated. Although for a time Sollitto's own home was listed for sale, he did

not make any effort to secure a mortgage to fund the purchase of the Stockdale property and he withdrew his home from the market after only a short time.

In September 1999, Sollitto, rather than either of the attorneys, arranged for a title search and title insurance through a friend of his. He did not send these documents to Foley or to Soons for their review. During the same time frame, however, Stockdale spoke with several of her acquaintances about her house. 'She told some that she was not sure whether or not she had actually agreed to sell the home, while lamenting to others that she was concerned that she had done so and that it was a "terrible mistake" because she had decided that, contrary to her wishes, Sollitto would in fact subdivide the property.

Throughout the time when these discussions were taking place, Stockdale's health continued to decline. Her weight had dwindled to ninety-six pounds, a loss of twenty pounds in five years. Throughout 1999 she suffered from decreased hearing and shortness of breath, had difficulty swallowing, and began to regurgitate food after eating. According to Dr. Raymond Masterson, the physician principally in charge of her care during that time, Stockdale's cognitive abilities were functioning as late as September 1999, but acquaintances testified that by October 1999, Stockdale appeared to be confused and kept repeating stories.

In early December 1999, Stockdale fell and fractured her hip. The record reflects that she lay undiscovered and unattended for about three days after she fell, trying to treat her injury with a heating pad. When one of her acquaintances, Carol Patterson, found her on December 9, it was only after breaking the doors down to get into the house to assist her; Stockdale had earlier removed the outer doorknobs and nailed the doors shut.

When Stockdale was admitted to the hospital, she was dehydrated and malnourished with extremely low electrolytes, which can cause periods of confusion. In addition, Dr. Masterson testified that the trauma of the hip fracture started her on the road to deterioration. Because he had known her prior to her hip frac-

ture, Dr. Masterson was able to opine that by mid-December, her condition was not only failing, but that it was noticeable. Sollitto visited Stockdale at the hospital every day, bringing her mail to her and helping her with her bills. He also began to involve himself in her medical care at this time, consulting with Dr. Masterson and other doctors in a manner that led Dr. Masterson to believe that he was a trusted friend of Stockdale's.

On December 14, 1999, following surgery that was required to treat her hip fracture, Stockdale was transferred to a rehabilitation facility; personnel there noted that her short-and long-term memory was impaired and that she was confused. From this point on, Stockdale's health continued to decline. Her doctors discovered a blockage in her throat that made it difficult for her to swallow and that progressed to the point that, from December 29 until it was corrected by surgery performed on January 4, Stockdale was not able to eat and was fed nutrients primarily through an IV tube. Throughout this time, Stockdale was also being treated with antibiotics, large doses of pain medication, and sedatives to help her sleep.

On December 18, 1999, the day after Stockdale underwent an endoscopy during which her doctor discovered Stockdale's throat blockage, Sollitto spoke with Stockdale about the still-pending deal for the sale of her home. Stockdale told him that she wanted to consult with an attorney, but that she did not want to speak with anyone locally. Sollitto testified that he called Soons and received no reply, but Soons's partner Cohen testified that their office files contained no record of such a call being received. Sollitto also testified that he tried to retain an attorney in Hackensack without success.

Sollitto's solution to the problem posed by Stockdale's request for the assistance of counsel was to send Michael A. Casale to see her in the rehabilitation facility on December 21, 1999. Casale testified that when he went to see Stockdale, she recognized his name and he did not therefore need to explain who he was, presumably meaning that Sollitto had already told her that Casale

would be coming at Sollitto's request to represent her. Whatever Casale said to her, he did not reveal that he had known Sollitto, and had enjoyed a close personal friendship with him, since the 1980's and had even been a member of Sollitto's wedding party. Casale did advise her that he had served as an attorney for Sollitto, but only referred to his representation of Sollitto in matters in the past and in a minor, then-current arbitration matter. Casale omitted telling her that his professional relationship with Sollitto was long-standing, that it was generally on-going, and that it included representation of both Sollitto and his wife.

During the December 21 meeting, Casale and Stockdale discussed the sale of her house. According to Casale, she was unconcerned about his past representation of Sollitto, or what she knew of it, and told him that she wanted to sell her home to Sollitto because he would not demolish it. Casale asserted that she also asked him to prepare a power of attorney and she discussed her 1998 Will. Casale testified that Stockdale told him that she made some changes to her will, and that he responded that Stockdale either had to make a codicil or execute a new will to effectuate those changes. Apparently, Stockdale then told Casale where in her house her 1998 Will was located, and Sollitto, not Casale, went there and retrieved it. Casale testified that he had a telephone conversation with Sollitto following his December 21 meeting with Stockdale, and following every meeting thereafter. In total, from December 18 to January 17, Casale and Sollitto spent 4.85 hours on the phone.

On December 27, 1999, Casale met with Stockdale for the second time at the rehab facility and they again discussed the sale of Stockdale's home. According to Casale, Stockdale agreed to accept from Sollitto approximately $50,000 in funds at the closing, with all of the remainder of the purchase price to be paid through a note and purchase money mortgage, at a five percent interest rate, even though the market interest rate at the time was seven to eight percent. During the same meeting, Casale and Stockdale

also reviewed the 1998 Will, and Casale claims that he observed that Stockdale had previously drawn a line through paragraph eighteen, the clause leaving her residuary estate to the First Aid Squad. Casale testified that Stockdale no longer wanted her residuary estate to go to the First Aid Squad because it had received money from another source.

On the afternoon of December 29, 1999, there was a thirty-two minute telephone call between Casale and Sollitto. Either that day or the next, Casale had his third meeting with Stockdale. According to Casale, Stockdale told him that she had decided to make Sollitto her residuary beneficiary because she felt close to him and his family. In addition, at Casale's suggestion, Stockdale agreed to include a provision in her new will to forgive any mortgage debt that might be owed on her death because Sollitto, as the residuary legatee, would get the money anyway after she died. Stockdale also decided, during the meeting on December 29th or 30th, to replace the previously-named co-executors, Soons and Kuzmick, and to name Casale as the sole executor of her estate; she decided to leave instead a small bequest to Soons "in appreciation for all of the services and kindness" to her and her late husband. Casale admits that he never discussed with Stockdale the dramatic impact that changing the residuary beneficiary from a charity to an individual would have on the estate's obligation to pay taxes.

Casale testified that when he spoke with Stockdale about these changes to her will, he knew she was scheduled to undergo throat surgery on January 4, 2000. He decided that he should have her execute the new will, as well as the closing documents relating to the sale of her property to Sollitto, prior to that surgery. Rather than waiting for Foley, who had been representing Sollitto, to return from a vacation trip he was then taking, Casale continued to effectuate the sale of the residence by preparing the real estate closing documents.

Sollitto testified that he telephoned Foley to tell him that Stockdale wanted to do the closing quickly and that her new

lawyer had prepared the documents. When Foley replied, "I hope you had nothing to do with the selection of that attorney," Sollitto said that he had not. Sollitto promised that he would fax the closing documents to Foley for his review, but Foley testified that he never saw any of them. Foley never sent Sollitto a bill, nor was he paid for any of the work he did on the contract. Casale never had a conversation with Foley, whom Casale described as having been "nonexistent ... from day one." Casale also described having a buyer who lacked an attorney with whom he could communicate as "a little unusual."

Prior to meeting with Stockdale on January 3, Casale prepared a letter to her advising her about some, but not all, of the conflicts of interest presented by his representation of her in light of his past, and his on-going, representation of Sollitto. In spite of the fact that he knew that she was in the hospital and about to undergo surgery, he sent the letter to her home. He did not ask her to sign it or acknowledge that she was aware of the conflicts; the letter, which should have been delivered to her home even though she was not there, was not found after her death.

Several witnesses testified about the events that took place late in the day on January 3, 2000. Casale met with Stockdale at the rehabilitation facility. Two of the nurses who saw her that day described her condition as "drawn" and "undernourished," but they also commented in their records that she was both alert and oriented to her surroundings. One of the supervisors at the facility, Sandra Clemento, and one of the social workers, Tami Pandulic, were called in by Casale to witness the signing of the new will. Because the rehabilitation facility had a policy that prohibited its personnel from acting as witnesses to the execution of wills, Clemento told Casale that she and Pandulic could only witness the fact of the signature on the document. Casale testified that, notwithstanding that limitation on the role of the witnesses, he asked Stockdale to declare that the document she was signing was her Last Will and Testament, and she confirmed that it was. However, neither witness agreed with that assertion.

Unlike the usual formalities that accompany the execution of a will, in this case, each of the witnesses only entered the room briefly. They testified that they saw Stockdale, who was sitting up, with her eyes open; that they saw Casale turn the pages of a document as Stockdale initialed each of them; and that they saw her sign the document, after which each of the witnesses added her own signature to the end of the document. According to each witness, although Stockdale might have acknowledged their presence in the room by saying hello, Stockdale did not utter a single word during the execution. One of the witnesses, Clemento, testified that she did not read the language of the self-proving affidavit that she signed, and that she specifically told Casale that by signing the document, she was only verifying that she observed Stockdale signing.

Neither witness testified that she was aware of whether Stockdale had the requisite testamentary capacity at the time when she signed her will. Dr. Alfred Hess, the director of the rehabilitation facility, testified that had he been advised that Stockdale was about to execute a new will and other documents, he would have insisted that she undergo a thorough exam to establish that she had the requisite capacity to do so. Even without that evidence to support him, Dr. Hess opined that Stockdale lacked the capacity to understand the documents she signed that day because she was taking pain killers and she was typically slightly confused during this time frame.

The will that was signed on January 3 ("2000 Will") was not the only document that was executed by Stockdale at that time. In addition, she signed a deed ("2000 Deed") transferring title to her house to Sollitto as well, although she received nothing in exchange from Sollitto, and he was neither present nor represented as would be customary in a true closing. The mortgage agreement and note, in which she essentially loaned Sollitto the overwhelming majority of the purchase price for that property, was signed later and backdated. Of the $1,290,000 purchase price for the Monroe Avenue home, Stockdale took back a $1,250,000 mort-

gage, and was to receive $54,665 from Sollitto, representing a downpayment and a variety of buyer's closing costs. In accordance with the terms of the mortgage, Sollitto was to pay interest at a five percent rate in fixed monthly mortgage payments of $4,000. The monthly rates would have been $23,589 had the mortgage been amortized.

Sollitto conceded that he spoke with Casale for one half-hour on January 4, the day after these documents were executed, and the day on which Stockdale underwent throat surgery. He maintained, however, that the two did not discuss the fact that he had been named as the residuary beneficiary under the 2000 Will, and he insisted that he was completely unaware that he had been so named until after Stockdale's death.

Stockdale returned to the rehabilitation facility after her throat surgery. Part of the procedure for her readmission to that facility required that she sign admission forms. On one of those forms, she signed her name correctly in one place, but, inexplicably, signed the same form elsewhere by using her maiden name, which she had not used for fifty years. In addition, in spite of the fact that just two days earlier, she had executed a medical directive along with the 2000 Will, during the readmission process, she indicated that she would be interested in being provided with such a form by the rehabilitation facility.

Stockdale continued her recovery at the rehabilitation institute until January 19, at which time she was released. Rather than assist her in returning to her home, Sollitto arranged for her to stay in a hotel for about two weeks and then moved her into an apartment that he had rented in her name. In addition, he and his wife arranged for a Russian-speaking schoolteacher to look after Stockdale at the hotel and apartment. In early February, Sollitto wrote a check to pay for utility charges on the Monroe Avenue house using his Power of Attorney to access Stockdale's funds. At around the same time, Stockdale began to bleed, and she was again hospitalized as a result. Ultimately, she spent ten days in the hospital being cared for until February 17, when she

was discharged and returned to the apartment. She was not seen and evaluated by a visiting nurse until March 7, by which time she was bedridden.

Not until the middle of March were any of her acquaintances able to find her. At that time, Carol Patterson located her in the apartment and went there to visit. On Patterson's first visit, she found Stockdale in pain and confused, with feces underneath her fingernails and what Patterson believed to be an infection on her face. She helped to clean Stockdale's face and fingernails and promised Stockdale that she would be back the next day. When, as promised, she returned the following day with a stew that she had made, she was interrupted by Sollitto who insisted that he was caring for Stockdale and that Patterson did not need to bring any more food or concern herself with Stockdale's care. Patterson and other witnesses described Stockdale throughout this time as weak, disoriented, and confused. She kept saying that she wanted "to go home."

Not long after Sollitto moved Stockdale into the apartment, he rented two cabanas located in the same apartment complex where Stockdale was then living. Sollitto later arrived in a truck with three other men and was observed moving furniture and pictures into the cabanas. He returned, with three different men, and emptied the cabanas after Stockdale died, loading all of the furniture and pictures into a truck and driving away.

Madeleine Stockdale died on April 18, 2000, of cardiac arrest and cardiovascular disease. The Sollittos were in Florida on vacation at the time. Sollitto made funeral arrangements from Florida, and paid the expenses, including another utility bill for the Monroe Avenue residence, by relying on his Power of Attorney designation, to write a check on Stockdale's account. At the time of Stockdale's death, the Monroe Avenue property was appraised "as is" at $1,730,000, with a market value, if it were subdivided, of $3,350,000. Under the 1998 Will, Stockdale's total liability for estate taxes would have been $7,650. Under the 2000 Will, her liability for estate taxes totaled $951,289.

## II.

On May 1, 2000, Casale offered the 2000 Will for probate; Soons, apparently unaware of the existence of any will other than the last one that he had prepared, had offered the 1998 Will for probate as well. Shortly thereafter, the First Aid Squad, which had been the residuary beneficiary under the 1998 Will, lodged a caveat against the 2000 Will. Casale, acting in his capacity as the executor under that will, filed a complaint in the Probate Part seeking to dismiss the caveat and proceeded by way of order to show cause seeking the admission of the 2000 Will to probate. The First Aid Squad answered the complaint and filed a third-party complaint against Sollitto and Casale seeking affirmative relief. In short, the First Aid Squad asserted that the 2000 Will was procured by undue influence and fraud, and that the inter vivos transfer of the title to Stockdale's home by deed was similarly flawed. As part of that third-party complaint, the First Aid Squad sought an order directing that the caveat be sustained; that the 2000 Will be rejected; that the 1998 Will be admitted to probate; that the 2000 Deed, along with the contract of sale for the house, be declared null and void; and that the First Aid Squad be awarded both compensatory and punitive damages, together with attorneys' fees. Sollitto and Casale defended the 2000 Will and Deed.

After an initial order naming a temporary executor of the estate to serve during the pendency of the proceedings, the parties engaged in extensive discovery and exchanged expert reports directed to the subject of Stockdale's mental capacity and her medical and mental condition around the time of the various events that are at the center of the dispute. During the proceedings, there was an allegation that Stockdale had added pencil notes, and had stricken out the reference to the First Aid Squad, on her copy of the 1998 Will, raising the possibility that the 1998 Will might itself be invalid. As a result, at the Court's invitation, Stockdale's two previously-disinherited nephews, George and Peter Lawrence, intervened in the matter, to protect their interest in

the estate as potential intestate heirs should the 1998 Will be deemed invalid as well.

Following a lengthy trial of the issues in the Probate Part, the trial judge issued a detailed opinion setting forth his findings of fact and conclusions of law. In addition to summarizing all of the salient evidence that had been presented by way of testimony and exhibits on the subjects of Stockdale's overall health and her medical condition, the negotiations about the sale of the house, and the execution of the 2000 Will and Deed, the court found that neither Sollitto nor Casale was a credible witness and offered numerous examples of testimony or of events and behaviors that supported that conclusion. In addition, the court concluded that Stockdale's 2000 Will was unenforceable as the product of undue influence, and that both the 2000 Deed and the 1999 real estate contract ("1999 Contract of Sale") transferring Stockdale's property to Sollitto were invalid as the product of undue influence and "sharp dealing."

The trial court therefore set aside the 2000 Deed, declared the 1999 Contract of Sale void ab initio, sustained the caveat, rejected the 2000 Will, and directed that the 1998 Will be admitted to probate. In addition, relying on this Court's decision in In re Niles, 176 N.J. 282, 823 A.2d 1 (2003), the trial court awarded the First Aid Squad attorneys' fees as a form of punitive damages. Although apparently concluding that attorneys' fees as such could not be awarded to a residuary beneficiary, the court reasoned that, pursuant to Niles, supra, "undue influence" is a form of intentional tort that provides the basis for awarding punitive damages. Further, the trial court found that "[t]he measure of [punitive] damages is the legal fees of the beneficiaries of the estate so that the estate is made whole." Thus, although the trial court purported to award punitive damages, it actually assessed the First Aid Squad's attorneys' fees against Sollitto and Casale. Following a hearing on September 8, 2004, the trial court fixed that award in favor of the First Aid Squad in the amount of $1,174,264.87, and determined that Sollitto and Casale, either

because they acted in concert, or because they acted as principal and agent, should be jointly, severally, and individually liable for that sum.

In a subsequently issued opinion, the Probate Part judge rejected applications filed on behalf of each of the interveners for an award of counsel fees. Because the only pencil notes Stockdale made were on her copy of the 1998 Will, the court reasoned that she had not obliterated the original so as to cancel it. In light of the fact that there was thus no "reasonable cause for contesting" the 1998 Will on that ground, the court concluded that neither intervenor was entitled to an award of counsel fees. *See R.* 4:42–9(a)(3).

In an unpublished opinion, the Appellate Division affirmed the decision of the Probate Part admitting the 1998 Will to probate, rejecting the proffered 2000 Will as the product of undue influence, and invalidating both the 2000 Deed and 1999 Contract of Sale of the Stockdale home. In large part, the panel relied on the extensive factual findings and the credibility determinations set forth by the Probate Part judge, agreeing that they were supported by substantial credible evidence and thus were worthy of deference. *See State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999); *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

However, the panel reversed the decision of the Probate Part judge to award the First Aid Squad its attorneys' fees and instead remanded for consideration of an award of punitive damages. In doing so, the Appellate Division noted that the trial court was mistaken in its view that an award of attorneys' fees under *Niles* is, or may be, a substitute for punitive damages. In its analysis, the panel found that the attorneys' fee award was not warranted under *Niles* because Stockdale's estate was not financially depleted by Casale's and Sollitto's conduct, and because there was no attorney-client relationship between Casale and the First Aid Squad. The court pointed to New Jersey's "strong policy" against shifting counsel fees, and reasoned that this matter did not

represent an exception to that general principle. In light of its determination that counsel fees were inappropriate under *Niles*, and because the Probate Part had used an analysis of attorneys' fees as its benchmark for the punitive award, the panel remanded the matter for reconsideration of the First Aid Squad's request for punitive damages.

## III.

Sollitto filed a petition for certification, challenging the directive of the Appellate Division to the Probate Part to consider anew the award of punitive damages. In part, he asserts that only a finding that he engaged in fraud or a similarly "evil-minded" act could, even in theory, support such an award and that the Probate Part's findings as to undue influence fall short of those required. Arguing that there was no evidence of any improper conduct on his part or any misrepresentations to Stockdale by him, he asserts that there is no basis in the record for a punitive award tested against ordinary tort law principles.[1]

Alternatively, Sollitto asserts that nothing in *Niles, supra,* authorized a punitive award. Although he implicitly urges us to embrace the Appellate Division's conclusion that the Probate Part judge erred in awarding counsel fees to the First Aid Squad, he reasons that *Niles* does not permit a punitive award in these circumstances because, unlike *Niles*, nothing he did harmed the estate financially. Conceding that the $1,500 he used from the estate assets to pay his personal utility bills might constitute a basis for a compensatory award, he nonetheless argues that in the

---

[1] Sollitto's petition sought certification on four issues, two of which were directed to claims that the trial court was biased and that the Appellate Division, in affirming that court's finding of undue influence, failed to apply the correct standard of review, and one of which related to the refusal to enforce the 1999 Contract for Sale of the real estate. We granted certification only as to the remaining issue raised, challenging the propriety of the remand for consideration of a punitive award. Sollitto was granted permission to file a supplemental brief directed only to that issue in which he raised the arguments that we recite herein.

absence of a finding that this constituted an intentional or evil-minded act on his part, no punitive award will lie.

Finally, Sollitto argues that a statement about theories of damages included in an unpublished 2003 Appellate Division decision[2] in an interlocutory appeal regarding whether he and Casale[3] would be permitted to be represented by joint counsel constitutes the "law of the case" that precludes a finding that he is liable for punitive damages.

The First Aid Squad urges this Court to affirm the Appellate Division's judgment, arguing that the theory of recovery articulated in *Niles* is sufficiently broad to support that court's analysis of its right to a punitive award. As such, the First Aid Squad asks this Court to interpret *Niles* broadly so as to recognize that it not only permitted a counsel fee award,[4] but that it created a tort-based theory of recovery in which both compensatory and punitive damages could also be assessed against individuals who engage in undue influence, as did Sollitto and Casale. More to the point, the First Aid Squad urges us to conclude that the Probate Part award included a compensatory component and that the behavior in

---

[2] Notwithstanding the clear requirements of *Rule* 1:36–3, Sollitto failed to provide the Court or, apparently, the other parties, with copies of this opinion on which he relies.

[3] Casale did not independently seek certification of any issue, instead joining in all of the arguments raised in Sollitto's petition and brief. He reasoned that the arguments applied with equal force to him in light of the entry of a joint and several judgment against him and he requested that this Court extend to him the benefit of any decision in Sollitto's favor.

[4] The First Aid Squad did not file a petition for certification and did not seek review of the Appellate Division's analysis of the limitations imposed by *Niles* on a counsel fee award that resulted in a decision adverse to the First Aid Squad on that claim. Nevertheless, the First Aid Squad asserts that because the tort-based remedy seeks to make the injured party whole, an award of its counsel fees as an expression of compensatory damages would be appropriate. Although we disagree with this assertion, we need not address it as it exceeds the scope of the issues raised in the petition for certification that this Court granted. *See R.* 2:12–11; *Skulski v. Nolan,* 68 *N.J.* 179, 208, 343 *A.*2d 721 (1975).

which Sollitto and Casale engaged was sufficiently egregious that it constitutes the kind of evil-minded behavior traditionally required to support a punitive award.

## IV.

We begin our discussion with a brief explanation of the proceedings and the remedies, unique to the Probate Part, that give context to our decision in *Niles*, and therefore that bear on our analysis of the issue before us. More particularly, we consider that forum and its unique remedies in the context of the single issue as to which we granted certification, namely, the parameters within which an award of punitive damages, as recognized in *Niles*, may be imposed in connection with a Probate Part proceeding.

### A.

Although there are a variety of proceedings that fall within the jurisdiction of the Probate Part, including, for example, the appointment of guardians and conservators, *see R.* 4:86, actions for settlement of fiduciary accounts, *see R.* 4:87 to :89, and declarations of death, *see R.* 4:93, among the most commonly filed matters in the Probate Part are those that relate to proceedings to probate wills and to settle questions that concern or touch on a decedent's estate. *See, e.g., R.* 4:82 to :85; *R.* 4:91; *R.* 4:92; *R.* 4:95–1. Collectively, these rules set forth the framework within which disputes arising in the context of the probate of a will are raised and adjudicated.

Although an uncontested, straightforward will may be admitted to probate through the Surrogate's Court, as distinguished from the Probate Part of the Chancery Division of the Superior Court, and although letters testamentary or letters of administration may be issued thereon in that forum, *see R.* 4:80–1(a), if there is a dispute about the will, *see In re Estate of Watson*, 35 *N.J.* 402, 409, 173 *A.*2d 266 (1961) (settling appoint-

ment of general administrator contest); *In re Estate of Somoza,* 186 *N.J.Super.* 102, 105–06, 451 *A.*2d 668 (Ch.Div.1982) (settling dispute over which court has jurisdiction in administration proceeding), or if a caveat has been lodged against the will offered or expected to be offered for probate, the Surrogate's Court is not empowered to act and the issues must instead be resolved through proceedings in the Superior Court, Chancery Division, Probate Part, *see R.* 4:83–1, –4.

 A caveat is the formal mechanism by which one gives notice of a challenge to a will that has been or is expected to be offered for probate. *See In re Myers' Will,* 20 *N.J.* 228, 235, 119 *A.*2d 129 (1955) (explaining that standing to lodge caveat requires status as one injured by probate of the will being contested); *In re Hand's Will,* 95 *N.J.Super.* 182, 187, 230 *A.*2d 408 (App.Div.) (analyzing requirement of injury sufficient for standing to lodge caveat), *certif. denied,* 50 *N.J.* 286, 234 *A.*2d 395 (1967). The act of lodging, or filing, the caveat prevents the Surrogate from issuing letters that otherwise would operate so as to authorize a particular individual or entity to begin the administration of the estate and causes the matter to be pursued, generally in a summary manner, by way of an order to show cause and formal complaint, in the Probate Part. *See R.* 4:83–1. Alternatively, if a will has already been admitted to probate, it may be challenged by the timely filing of a complaint in the Probate Part. *See R.* 4:85–1. Regardless of whether the matter begins with the lodging of a caveat, *see R.* 4:82(1), or with the filing of a complaint after a will has already been admitted to probate, *see R.* 4:85–1, a variety of grounds on which to secure relief are generally available, the most common of which is the assertion that the will was the product of undue influence.

 In a Probate Part proceeding in which a caveator or challenger seeks to set aside a will based on an assertion that it was the product of undue influence, the burdens of proof and the issues to be considered have been firmly established in our case law. As this Court has explained, undue influence is a mental,

moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets, generally by means of a will or inter vivos transfer in lieu thereof. *Haynes v. First Nat'l State Bank*, 87 *N.J.* 163, 176, 432 *A.2d* 890 (1981). It denotes conduct that causes the testator to accept the "domination and influence of another" rather than follow his or her own wishes. *Ibid.* (quoting *In re Neuman*, 133 *N.J. Eq.* 532, 534, 32 *A.2d* 826 (E. & A.1943)).

Ordinarily, the burden of proving undue influence falls on the will contestant. Nevertheless, we have long held that if the will benefits one who stood in a confidential relationship to the testator and if there are additional "suspicious" circumstances, the burden shifts to the party who stood in that relationship to the testator. *In re Rittenhouse's Will*, 19 *N.J.* 376, 378–79, 117 *A.2d* 401 (1955); *see In re Blake's Will*, 21 *N.J.* 50, 55–56, 120 *A.2d* 745 (1956); *In re Davis's Will*, 14 *N.J.* 166, 170, 101 *A.2d* 521 (1953). In general, there is a confidential relationship if the testator, "by reason of ... weakness or dependence," reposes trust in the particular beneficiary, or if the parties occupied a "relation[ship] in which reliance [was] naturally inspired or in fact exist[ed]." *In re Hopper*, 9 *N.J.* 280, 282, 88 *A.2d* 193 (1952). Suspicious circumstances, for purposes of this burden shifting, need only be slight. *Rittenhouse's Will*, *supra*, 19 *N.J.* at 379, 117 *A.2d* 401.

When there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption. Although that burden of proof is usually discharged in accordance with the preponderance of the evidence standard, *In re Catelli's Will*, 361 *N.J.Super.* 478, 487, 825 *A.2d* 1209 (App.Div. 2003), if the presumption arises from "a professional conflict of interest on the part of an attorney, coupled with confidential relationships between a testator and the beneficiary as well as the attorney," the presumption must instead be rebutted by clear and convincing evidence. *Haynes*, *supra*, 87 *N.J.* at 183, 432 *A.2d* 890.

An attorney-client relationship is inherently a confidential relationship, *see In re LiVolsi,* 85 *N.J.* 576, 588, 428 *A.*2d 1268 (1981); *Davis's Will, supra,* 14 *N.J.* at 169, 101 *A.*2d 521, and because suspicious circumstances need only be slight, the existence of that relationship alone often results in both the shifting of the burden of proof and in the imposition of the heavier burden of clear and convincing evidence to rebut the presumption.

As a practical matter, then, parties proceeding in the Probate Part based on an assertion of undue influence, whether they are themselves the caveators or are interested, putative, beneficiaries, are engaged in a proceeding in which they seek the particular, equitable, remedies unique to that Part. The claim of undue influence is, in that context, ordinarily a means to cause a proffered will to be rejected and another admitted to probate. In these circumstances, undue influence is not a separately pleaded tort, but is the analytical framework within which the decision about whether to admit a will to probate is made. Moreover, if none of the competing parties has either commenced to serve as an executor or gained control of estate assets, either through an inter vivos transfer, or through use of a power of attorney, or as a beneficiary, there is generally no need to assert a separate tort-based cause of action. Rather, because in those circumstances there has been no loss suffered by the estate, the only remedy sought is the admission of a particular will to probate. In that context, nothing in the way of compensatory damages is sought or need be available and, by extension, there can be no basis for a claim for punitive damages.

In Probate Part matters, a tort-based claim, at least in theory, can only arise if someone has acted so as to deplete the estate of its assets or reduce the assets of the estate in some fashion. Even then, the circumstances in which a tort-based theory coexists with a Probate Part proceeding are relatively unusual. Indeed, remedies traditionally available in the Probate Part, because it is a court of equity, include forms of relief against an executor or other fiduciary that are not, strictly speaking,

compensatory awards. Notwithstanding the fact that monetary amounts may be assessed in an estate proceeding in the nature of an accounting, *see R.* 4:87, in which an executor or other fiduciary may be surcharged, or in which a part of an accounting may be disallowed, those are not compensatory damage awards. An executor or other fiduciary is entitled by statute to commissions, both based on income to the estate during administration, *see N.J.S.A.* 3B:18–13, and based on the estate corpus, *see N.J.S.A.* 3B:18–14, which would be payable from estate assets. Therefore, the surcharge, in actuality, may be an offset against anticipated statutory commissions that, in general, does not equate with a compensatory award. That being the case, in Probate Part proceedings there is usually neither a compensatory damage-type award nor, by extension, the underpinnings needed for imposition of a punitive award.

To be sure, we have long recognized both in tort and through a statutorily-sanctioned cause of action, *see N.J.S.A.* 3B:14–35, that there are avenues for recovery as against an executor or other fiduciary who breaches his or her duty to secure or protect estate assets. *See, e.g., In re Maxwell's Will,* 306 *N.J.Super.* 563, 586, 704 *A.2d* 49 (App.Div.1997) (allowing remaindermen to challenge the minimal performance of the trust corpus), *certif. denied,* 153 *N.J.* 214, 708 *A.2d* 65 (1998); *Semler v. CoreStates Bank,* 301 *N.J.Super.* 164, 173–74, 693 *A.2d* 1198 (App.Div.) (defining basis for cause of action against executor for breach of fiduciary duty), *certif. denied,* 151 *N.J.* 467, 700 *A.2d* 879 (1997). Although such a separately pleaded cause of action for breach of fiduciary duty may be pursued as part of the proceedings in the Probate Part, it may or may not result in a damage award that exceeds statutory commissions and thus is entered as a judgment.

### B.

It is only in the context of the proceedings in the Probate Part, and in light of the analytical framework illustrated by these basic propositions, that the Court's decision in *Niles* can be understood.

For purposes of our consideration of the issue before us, three of the facts or circumstances that were critical to the *Niles* decision are relevant to our analysis.

First, the claims in *Niles* were presented by the substitute executor on behalf of the estate. The cost to the estate of recovering the assets that were wrongfully, that is tortiously, taken as represented by the substitute executor's attorneys' fees well supported our decision that a counsel fee award would be permitted.

Second, although the tortious actions undertaken in *Niles* were acts of a fiduciary, the effect was to strip the estate of virtually all of its assets by means of both inter vivos and post-death transfers. In that context, reliance on the usual Probate Part remedy of surcharge in the sense of an offset against commissions or even as against a bequest otherwise due was wholly inadequate. As a result, because they were the acts of a fiduciary, we acknowledged that a tort-based recovery, including a punitive award, might also be appropriate. That analysis rested on the implicit assumption that the usual surcharge remedy would be inadequate and a compensatory award might be needed to make the estate whole.

Third, it was significant that the two individuals who were the actors in *Niles* were strangers to the natural bounty of the testatrix and who, solely through the mechanism of undue influence, both gained access to her and then used their confidential relationship to overbear her will to their personal benefit. In that context, the behavior in which they engaged, and the breadth of its scope, was aptly described as "pernicious" and deserving of our recognition that it would support a counsel fee award, as well as a potential punitive remedy. However, merely because we did not separately address, in that context, the requirement of a compensatory award does not equate with an intention to create an entirely new tort or to recognize the existence of a punitive award untethered from that necessary predicate.

The heart of our analysis in *Niles* related to the discussion about the propriety of a counsel fee award. That is to say, in

*Niles* we recognized that *Rule* 4:42–9(a), which provides that "[n]o fee for legal services shall be allowed in the taxed costs or otherwise, except" in circumstances specifically enumerated in the *Rules* themselves, or when such fees are specifically provided for by statute, embodies New Jersey's strong public policy against shifting counsel fees from one party to another. *Niles, supra,* 176 *N.J.* at 293, 823 *A.*2d 1. "This Court has embraced that policy by adopting the 'American Rule,' which prohibits recovery of counsel fees by the prevailing party against the losing party." *Id.* at 294, 823 *A.*2d 1.

Prior to our decision in *Niles,* we had permitted only a few exceptions to the American Rule, other than those included in *Rule* 4:42–9 itself. We had recognized, for example, an exception arising in the context of successful claims for attorney malpractice, *Saffer v. Willoughby,* 143 *N.J.* 256, 272, 670 *A.*2d 527 (1996); in claims against attorneys who intentionally violate their fiduciary duties, *Packard–Bamberger & Co. v. Collier,* 167 *N.J.* 427, 443, 771 *A.*2d 1194 (2001); and in estate administrator malfeasance claims covered by terms of a surety bond, *In re Estate of Lash,* 169 *N.J.* 20, 28–29, 776 *A.*2d 765 (2001). In *Niles,* we added a further narrow exception, which was directed solely to circumstances in which "an executor or trustee commits the pernicious tort of undue influence ... [such as to allow] the estate to be made whole by an assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate." *Niles, supra,* 176 *N.J.* at 298–99, 823 *A.*2d 1.

In *Niles,* however, we also recognized the possibility of a punitive damage award arising from the "pernicious tort of undue influence." *Niles, supra,* 176 *N.J.* at 300, 823 *A.*2d 1. Our description of that underlying tort was supported by reference to an Appellate Division decision, in which that court recognized that undue influence is a "species of fraud." *In re Landsman's Will,* 319 *N.J.Super.* 252, 276, 725 *A.*2d 90 (App.Div.1999). In the circumstances of that case, however, the undue influence was exerted by a stranger to the testator who became the executor

and who received counsel fees for his service in that role. *Id.* at 259, 725 *A.*2d 90. To correct the effect of that fiduciary's undue influence, the Appellate Division ordered that he return to the estate all of the counsel fees he had been paid. *Id.* at 276, 725 *A.*2d 90.

In like manner, in *Niles,* we recognized that there are situations in which a remedy, like punitive damages, arises outside of the ordinary constraints of the equitable relief available in the Probate Part. Although we did not particularly describe its parameters, they are clear from the context in which we recognized the potential for such a remedy. First, because undue influence that results in an individual gaining the capacity to act as a fiduciary falls within the scope of other remedies, we necessarily limited the availability of the tort to which we referred to those situations in which the ordinary remedies for breach of fiduciary duty will not lie or will be inadequate. Second, we limited our focus to those situations in which one who is essentially a stranger to the testator gains access to him or her through undue influence and then carries out a scheme to place himself or herself into a position to seize control of that testator's assets through inter vivos transfer or by bequest. In those relatively limited circumstances, we concluded that the behavior itself is "pernicious," with the result that such an individual may be liable for punitive damages. *Niles, supra,* 176 *N.J.* at 300, 823 *A.*2d 1.

However, as we recognized in *Niles,* a punitive damage award is governed by the statutory provisions of the Punitive Damages Act, *N.J.S.A.* 2A:15–5.9 to –5.17. *See Niles, supra,* 176 *N.J.* at 300, 823 *A.*2d 1. The Act provides much of the analytical framework that informs our understanding of the requisite proofs, save for the fact that the underlying cause of action is one that proceeds in the Probate Part in the context of a will contest. Therefore, as in all punitive awards, the requirements are that the relief be specifically sought in the complaint, *see N.J.S.A.* 2A:15–5.11; that there be an award of compensatory damages, *see N.J.S.A.* 2A:15–5.13(b); and that the party seeking the award

demonstrate, by clear and convincing evidence, that the acts or omissions of the actor causing the harm must have been "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions," *see N.J.S.A.* 2A:15–5.12(a). Moreover, the Act sets forth additional, required considerations to be taken into account by way of relevant evidence bearing on the propriety of such an award, *see N.J.S.A.* 2A:15–5.12(b), and the amount thereof, *see N.J.S.A.* 2A:15–5.12(c). Nothing in our decision in *Niles* suggests that a punitive award arising in the Probate Part may proceed in the absence of compliance with each of these statutory prerequisites. On the contrary, the only question is how to interpret these requirements in the context of the unique remedies ordinarily available in that forum.

Regardless of its theoretical availability, because of the requirement that there be a compensatory award, the remedy will only be available infrequently in Probate Part proceedings. That is, only in the circumstances in which the actor is not entitled to take from the estate by inheritance or through commissions, and thus in which an accounting and the surcharge remedy will be inadequate to restore the estate to its proper balance, will there even potentially be a basis for a compensatory, and thus a punitive, award.

The matter now before the Court not only illustrates the meaning and intent of the relatively limited nature of the remedy we addressed in *Niles,* but affords us the opportunity to explain the parameters appropriate to the punitive award to which we there referred. To begin with, in estate contest proceedings, the allegation of undue influence between parties who are among those who would be the natural objects of the testator's bounty, and who stand in like relationship to the testator, do not usually involve a separate tort-based claim of the kind to which we adverted in *Niles.*

That is to say, if, for example, two siblings dispute whether one, by undue influence, has obtained an otherwise out-of-the-ordinary

inheritance, the assertion of undue influence is simply the framework for the Probate Part decision about which will is to be admitted to probate and which is to be rejected. In that context, and particularly if neither sibling has been empowered to stand in a fiduciary relationship to the testator, for example, by use of a power of attorney or as an executor, no transfer of property will have occurred and the selection of which will to admit to probate will protect the interests of each. Even if one has acted so as to seize control of assets, most often the commission and surcharge remedy available in connection with an accounting will suffice. Although the sibling who becomes empowered to act as an executor might be liable for an award of attorneys' fees payable to the other sibling who succeeds in proving that this was accomplished through undue influence, *see In re Estate of Vayda*, 184 *N.J.* 115, 124 n.4, 875 *A.*2d 925 (2005), standing alone, that would not create the basis for a punitive award. In circumstances arising between siblings, for example, or individuals who are otherwise the natural objects of a testator's bounty, there is ordinarily no basis on which, in fact or theory, to make a compensatory award, regardless of whether a tort-based cause of action has been included in a pleading. Such disputes simply do not call for any tort-based assertions and therefore do not bring into play either the attorneys' fees or the punitive damage theories addressed in *Niles.*

Instead, in *Niles,* as in this case, the possibility of a tort-based claim only exists because, apart from the undue influence theory that gives rise to the estate contest itself and that informs the probate analysis, the fact that a stranger to the testator's natural bounty has gained access to his or her confidence and, potentially, to his or her assets, might give rise to a tort-based claim and to tort-based remedies apart from those otherwise available in the Probate Part. At the same time, an understanding of *Niles* requires an appreciation for the fact that the actors there also operated as fiduciaries, for it is only in this Court's analysis of that role, and in this Court's imposition of a counsel fee arising from that role, that the references to the tort-based theory and to the potential for an award of punitive damages can be explained.

## V.

In light of this further explanation of the parameters of the tort that we described in *Niles*, we turn to an analysis of the issues before us. We begin by observing that Sollitto and Casale were complete strangers to Stockdale and, because neither served as a fiduciary of the estate, they are individuals as to whom the unique remedy of surcharge cannot be sufficient. In this context, the question then must be whether, once the will procured by undue influence has been refused probate, and, in this particular case once the inter vivos transfer of Stockdale's home to Sollitto has been voided, there have been damages to the estate or, theoretically, to its true beneficiaries, that are compensable only in tort. If so, then the tort remedies of compensation and, depending upon the circumstances, punitive damages will be available.

## A.

We begin our analysis of whether there is a basis in this record to enter a compensatory or a punitive award by rejecting as meritless Sollitto's argument that the "law of the case" doctrine prevents such a finding. This discretionary doctrine merely operates to prevent relitigation of a previously resolved issue. *See* Pressler, *Current N.J. Court Rules*, comment 4 on *R.* 1:36–3 (2008) (noting "law of the case" doctrine is a "nonbinding discretionary rule intended, unless there is good cause not to do so, to avoid relitigation before the same court of the same issue in the same controversy...."). Pointing to an unpublished decision of the Appellate Division issued on an interlocutory appeal in this matter, Sollitto argues that a comment that the panel was not aware "of a cause of action that survives the decedent and permits general money damages for wrongdoing practiced during decedent's life where its only manifestation is an invalid will or voidable real estate sale," mandates that no damages may be imposed against him in a later proceeding.

Apart from the fact that the quoted language from that opinion does not represent a decision by the panel on any issue and thus

does not fall within the parameters of the doctrine, the language on which Sollitto relies itself demonstrates the error in his analysis. The factual premise of that interlocutory decision is that there had been no loss suffered and that therefore no money damages could be awarded. The argument before this Court, however, is that there was a loss apart from the invalid will or contract and that therefore a tort-based remedy is available. Viewed in this light, there is no basis on which to conclude that the earlier decision precludes consideration of the question about whether this record will support the type of tort-based remedy recognized in *Niles*.

### B.

Turning to the substance of the matter before this Court, it differs, both factually and as a matter of law, from *Niles* in several important respects. First, in spite of their efforts, neither Casale nor Sollitto managed to achieve complete control over Stockdale's property or her estate, either before or after her death. Because Stockdale did not long survive the 2000 Will and Deed, neither Casale nor Sollitto depleted her estate in the significant way that the actors did in *Niles*. Second, unlike *Niles*, the First Aid Squad, as a putative residuary beneficiary, was the party that lodged the caveat and pursued relief against Casale and Sollitto; neither the estate itself nor any executor or administrator thereof pursued any claim. Third, consistent with the Court's guidance in *Niles*, the First Aid Squad interposed a pleading in which it sought tort-based damages. Although those asserted claims also bore on the purely probate remedy of setting aside the 2000 Will, they were not limited to that form of relief.

These distinctions between this matter and *Niles* underscore the fact that *Niles* created a specific and rather limited exception to the American Rule as it relates to awards of counsel fees, and also make it plain that the issue before the Court in *Niles* was not, as here, also a claim for a tort-based punitive damage award. These distinctions, to begin with, explain why the

Appellate Division quite correctly concluded that the First Aid Squad was not entitled to an award of attorneys' fees, regardless of the efforts by Sollitto and Casale to eliminate Soons as the executor and to replace the First Aid Squad as the residuary beneficiary. Simply put, because the claim in this matter was brought by a putative beneficiary rather than by the substitute executor, no counsel fee could be awarded. As the Appellate Division recognized, that form of relief, permitted in *Niles*, is not a broader pronouncement about the availability of attorneys' fees in estate contests.

However, because Sollitto and Casale were strangers to Stockdale, because they engaged in undue influence to procure the 1999 Contract of Sale, the 2000 Will and the 2000 Deed, because a tort-based remedy was sought in the complaint, and because the loss could never be addressed through the ordinary Probate Part remedies, the question is not whether a punitive damage award is available in theory. Plainly, under our analysis in *Niles,* it is. Rather, the issue is whether there is evidence in the record that would support a compensatory award and, thereafter, a punitive one.

Although neither the Probate Part judge nor the Appellate Division analyzed the record in terms of a possible compensatory award, we attribute that only to the manner in which the basis for a punitive award was initially described in *Niles.* That is, because in *Niles* we primarily addressed the issue of a counsel fee award, appropriate there in light of the status of the parties, but not available here, both the Probate Part judge and the Appellate Division inadvertently overlooked the implications of the Punitive Damages Act in their respective analyses of the punitive damages remedy.

Notwithstanding that inappropriate focus, the record before us includes ample facts and circumstances that would support a compensatory award and, potentially, a punitive one as well. That Sollitto and Casale were unable to loot Stockdale's estate in the extraordinary and thorough manner that the actors in *Niles*

achieved is of no moment in the consideration of the parameters for a punitive award. Rather, in addition to Sollitto's concession that he made approximately $1,500 in payments, using Stockdale's assets, for utilities at a time when the home had been deeded to him and at a time when she was precluded from even entering it, the record also includes evidence that Sollitto failed to pay most of the minimal mortgage payments due, regarded the home as his own, used it while she was forced to live in an apartment secluded from even her acquaintances, and thus likely incurred greater utility expenses than would otherwise have been the case. Further, there is evidence that Sollitto "spirited away" Stockdale's antique furniture and pictures from the residence after moving her to the apartment. As to Casale, the record reflects that he was paid a fee for his role in securing the 1999 Contract of Sale and the 2000 Deed, which was funded by Stockdale. In the context of strangers to the estate, none of these items could be restored to the estate through the usual Probate Part mechanism of surcharge; each therefore, at least potentially would support a compensatory and therefore, a punitive award.

Similarly, although neither the Probate Part judge nor the Appellate Division considered whether Sollitto or Casale acted with actual malice, or with "wanton and willful disregard" for the rights of the estate's eventual beneficiaries, see N.J.S.A. 2A:15-5.12(a), there is much in the Probate Part judge's findings of fact that bespeak intent of that type and quality.

We do not intend to suggest that an award of punitive damages, or even a compensatory award, must in fact be made in this matter; we note only that the record suggests a basis for each consistent with the proceedings in the Probate Part. Only the apparent confusion about the parameters of the available remedies, it appears, prevented the Probate Part and the Appellate Division from engaging in the appropriate analysis of the record that already exists. Seen, however, through the prism of our fuller explanation here of the meaning and scope of the punitive award in a Probate Part proceeding, it may well be that such an

award is appropriate. We leave it to the sound discretion of the Probate Part judge to consider the record in light of this further guidance.

## VI.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the Chancery Division, Probate Part, for further proceedings consistent with this decision.

*For affirmance as modified/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE, RIVERA-SOTO, and HOENS—6.

*Opposing*—None.